750 So.2d 949 (1999)
Deborah BATSON, Eula Maye Batson and Billy M. Batson
v.
SOUTH LOUISIANA MEDICAL CENTER and State of Louisiana, Through the Department of Health and Human Resources.
No. 99-C-0232.
Supreme Court of Louisiana.
November 19, 1999.
*950 Herbert William Barnes, Jr., Michael J. Samanie, Samanie, Barnes & Allen, Houma, Counsel for Appellant.
Gregory Carl Weiss, Weiss & Eason, New Orleans; Meredith Margaret Miceli, Frederick Thomas Greschner, Jr., Peter Elliot Sperling, Greg Anthony Pellegrini, Frilot, Partridge, Kohnke & Clements, New Orleans; Richard P. Ieyoub, Attorney General; Joseph A. Reilly, Jr., Henderson, Hanemann & Morris, Houma, Counsel for Respondent.
Gregory David Frost, Larry Michael Roedel, Baton Rouge, Counsel for Amicus Curiae Louisiana Dental Ass'n.
Carlton Jones, III, David Alva Woolridge, Jr., Baton Rouge, Counsel for Amicus Curiae Patients Compensation.
Charles Fenner Gay, Jr., New Orleans, Amy Collier Lambert, Baton Rouge, Cristina Romig Wheat, New Orleans, Counsel for Amicus Curiae Ochsner Alton Medical Foundation, Ochsner Clinic.
Susan Elizabeth Henning, New Orleans, Counsel for Amicus Curiae Christian Health.
Peter J. Butler, Peter J. Butler, Jr., Michael Charles Luquet, New Orleans, Counsel for Amicus Curiae Hospital Service Dist. #1 d/b/a West Jefferson Medical Center.
Chris James LeBlanc, Robert L. Roland, Baton Rouge, Counsel for Amicus Curiae Louisiana Hospital Association.
JOHNSON, Justice.[*]
Plaintiff, Deborah Batson, brought this action to recover damages for injuries she *951 sustained while hospitalized at South Louisiana Medical Center in Houma, Louisiana. We granted this writ of certiorari to determine whether the Malpractice Liability for State Services Act (MLSSA) prohibits multiple statutory caps for multiple acts of negligence which produce separate and independent damages. After a thorough review of the record, LSA-R.S. 40:1299.39(F), and related jurisprudence, we conclude that the MLSSA allows multiple caps for damages when separate acts of negligence are ascertainable and the resulting injuries are separable. Accordingly, we reverse the court of appeal's decision and remand this case to the court of appeal to determine the issue of damages under each cap.

FACTS AND PROCEDURAL HISTORY
On July 26, 1990, plaintiff, Deborah Batson, a thirty-seven year old woman, was brought to the emergency room at South Louisiana Medical Center (SLMC). Ms. Batson, who had a history of peptic ulcer disease, was admitted to the hospital for treatment of a bleeding ulcer and underwent a surgical procedure to correct the bleeding. Pre-operatively and post-operatively, the treating physicians failed to prescribe antibiotics to prevent her from developing an infection. Within hours after her surgery, Ms. Batson began to exhibit signs of an infection. She developed a fever in excess of 102 degrees, which continued for at least five days, a rapid heartbeat, rapid respirations, sweating, restlessness, and abdominal pain. Five days following her surgery, Ms. Batson's surgical incision opened up, and purulent material drained from the incision site. It was only then that physicians initiated antibiotic therapy. By the time she was started on antibiotics, she had developed sepsis (infection of the blood). As a result of the infection and sepsis, Ms. Batson developed adult respiratory distress syndrome and was placed in the intensive care unit (ICU), where she remained for six months and seventeen days. During her prolonged stay in the ICU, Ms. Batson had a myocardial infarction (heart attack) and had to be resuscitated on several occasions. Ms. Batson's total hospitalization lasted nine months.
During her hospitalization, the nursing staff failed to frequently re-position Ms. Batson, an intervention which is designed to prevent the development of decubitus ulcers (bed sores). As a result, she developed multiple decubitus ulcers, which extended from her sacral area to her hips, legs, and ankles. The decubiti resulted in severe scarring of the lower half of Ms. Batson's body. Ultimately, Ms. Batson underwent pigskin grafting to close the wounds and improve the scarring.
Ms. Batson also developed severe flexion contractures of the hips, knees, and ankles, and she literally drew up into the fetal position. The contractures resulted from prolonged immobilization during her hospitalization. Experts testified that the contractures, which developed and progressed over a long period of time, were preventable with proper orthopedic and sufficient physical therapy care. Even the defendants' experts testified that they had never seen contractures of this degree develop during treatment in a hospital. The contractures were 100% disabling at the time of Ms. Batson's discharge from SLMC. Subsequently, Ms. Batson underwent surgical procedures to correct the flexion contractures. The procedures were moderately successful: Ms. Batson is in a "much straighter" position than the original fetal position.
During Ms. Batson's hospitalization, she mysteriously sustained a fracture of her right hip. SLMC could never explain how or when the fracture occurred. As a result of her prolonged antibiotic therapy, Ms. Batson developed a 62% loss in hearing. As a consequence of the sepsis, she suffered an injury to her brain, resulting in permanent cognitive dysfunction. Another consequence of the sepsis was the development of a platelet deficiency which required a splenectomy to correct. During the splenectomy, Ms. Batson suffered a near fatal blood clot. She later *952 developed diffuse intravascular coagulopathy (DIC) which resulted in severe vaginal bleeding which also required surgery. As a result of long-term catherization and atrophy of the bladder, she developed urinary incontinence.
Ms. Batson was discharged from SLMC on April 5, 1991. She was transferred to Heritage Manor Nursing home to receive long-term care for the flexion contractures and the decubiti. She remained at the nursing home for nearly two years.
Ms. Batson is currently primarily wheelchair bound. Her orthopedic surgeon testified that she has limited physical mobility and is only able to walk very short distances, i.e. from the kitchen table to the kitchen sink, and from the wheelchair to the bed, with the use of braces and crutches. The doctor also opined that Ms. Batson's limited mobility will decrease in the future, and she will be permanently wheelchair bound. Ms. Batson's elderly parents assist her in normal activities of daily living, as she is unable to perform them independently.
On July 19, 1991, Ms. Batson and her parents, Eula Maye Batson and Billy Batson, filed a petition for damages, naming as defendants, SLMC and the State of Louisiana, through the Department of Health and Human Resources, Office of Hospitals. Plaintiffs alleged that Ms. Batson's injuries were the result of SLMC's negligence in failing to properly and timely diagnose Ms. Batson's condition, failing to provide adequate and competent medical testing, failing to provide the proper standard of care required, and failing to obtain informed consent.
Plaintiffs later amended their petition to add Louisiana Physical Therapy and Athletic Rehabilitation, Inc. (LPT & AR); Medforce International, Inc. (Medforce International); Medforce Physical Therapy Services, Inc.; Sunbelt Physical Therapy Services, Inc., Robert Rowe; and Leah Angelito as defendants. Plaintiffs alleged that those defendants are jointly and solidarily liable with SLMC for negligently treating Ms. Batson.[2] The private defendants *953 filed separate appeals; therefore, this opinion will not include a discussion of those defendants.
The state defendants were tried by the bench, and after a four week trial, the trial court rendered judgment in favor of plaintiffs, finding that the state defendants (hereinafter "defendants") breached the required standard of care in their treatment of Ms. Batson. The court also found that defendants' negligence was the legal cause in fact of plaintiffs' injuries. The trial court specifically found that the sepsis and related injuries, flexion contractures, and decubitus ulcers were separate and unrelated items of damages. Therefore, the trial court concluded that a separate cap set forth in LSA-R.S. 40:1299.39(F) applies to each independent act of negligence causing a separate and independent injury.
The trial court found that defendants were 100% at fault in the cause of Ms. Batson's sepsis, hearing loss, brain injuries, and incontinence. For that injury, the trial court awarded Ms. Batson $249,791.03 for past medical expenses, $87,049.75 for future medical expenses, and $500,000.00 for all other general and special damages. The trial court also found defendants 60% at fault in causing Ms. Batson's flexion contracture injuries and awarded her $322,169.95 for past medical expenses, $900,000.00 for future medical expenses, and $500,000.00 for all other damages. The court further found defendants 70% at fault in causing Ms. Batson's decubitus ulcers and awarded her $78,352.36 for past medical expenses, $70,000.00 for future medical expenses, and $500,000.00 in general damages.
Defendants appealed the trial court's judgment. The court of appeal reversed the trial court's judgment which allowed multiple caps under the MLSSA and applied one $500,000.00 cap for all plaintiffs' injuries and/or claims. The court of appeal further ruled that the cap on damages under the MLSSA is constitutional. The trial court's judgment was affirmed in all other aspects. Batson v. South La. Med. Ctr., 98-0038 (La.App. 1 Cir. 12/28/98); 727 So.2d 613. Plaintiffs filed an application for certiorari with this court, and by order dated April 1, 1999, we granted their writ application. Batson v. South La. Med. Ctr., 99-0232 (La.4/1/99); 741 So.2d 1276.

DISCUSSION
In granting this application for writ of certiorari, we specifically requested that the parties limit their argument to the court of appeal's holding that only one cap applies to plaintiff's injuries under the MLSSA. Therefore, our consideration and discussion is strictly limited to that issue, and the court of appeal's resolution of the other issues is the final disposition of those matters.

Standard of Review
A trial court's findings of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State of Louisiana, Through Dep't of Transp. and Dev., 92-1328 (La.4/12/93), 617 So.2d 880. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Id. at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. The reviewing court must always keep in mind that "if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 882-83 (citing Housley v. Cerise, 579 So.2d 973 (La.1991)) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
In the instant case, plaintiffs argue that Ms. Batson suffered multiple and separate *954 injuries from multiple and separate acts of negligence:
1) Negligence of surgeons that resulted in infection and sepsis, nearly ten months of hospitalization, six months in ICU, hearing loss, and loss of cognitive abilities.
2) Negligence of orthopedic surgeons and physical therapists that resulted in severe flexion contractures and its sequela.
3) Negligence of ICU physicians and nursing staff that resulted in severe and disabling decubitus ulcers.
Defendants assert that Ms. Batson's injuries were not separable or distinct. According to defendants, Ms. Batson's decubitus ulcers and flexion contractures were merely unfortunate consequences of the sepsis. Defendants further argue the injuries are indivisible because the acts of the physicians, nurses, and physical therapists were a concerted effort to treat Ms. Batson.
The jury specifically found: 1) defendants were negligent by breaching the standard of care in their treatment of Ms. Batson and that negligence was a proximate cause of the sepsis or an aggravation of the sepsis; 2) defendants were negligent by breaching the standard of care in their treatment of Ms. Batson relative to the flexion contractures and that negligence was a proximate cause or an aggravation of the flexion contractures; 3) defendants were negligent by breaching the standard of care in their treatment of Ms. Batson relative to the decubitus ulcers and that negligence was a proximate cause of the decubitus ulcers or an aggravation of the decubitus ulcers. We find that the record supports the jury's determination that the sepsis and related injuries, flexion contractures, and decubitus ulcers constitute three separate items of damage.
It seems elementary that, but for contracting sepsis, Ms. Batson probably would not have developed the decubitus ulcers and the flexion contractures. In fact, but for Ms. Batson having a bleeding ulcer, she would not have been admitted to the hospital at all and therefore, would probably not have developed sepsis. The "but for" analysis can continue infinitely. However, the medical testimony is clear: sepsis is not the direct cause of flexion contractures or decubitus ulcers. Dr. Martin Raff, an internist who specializes in infectious diseases, testified that the failure to administer pre-operative antibiotics increased Ms. Batson's risk of developing sepsis. He further testified that Ms. Batson's medical records reveal that the day after the surgery, Ms. Batson's physicians ordered blood cultures, an act which indicates that they suspected she was developing sepsis. Therefore, he concluded that their failure to order antibiotics is "unexplainable." Dr. Raff opined that the physicians' failure to order postoperative antibiotics caused Ms. Batson to develop sepsis. According to Dr. Michael Butler, a witness testifying for the defense, sepsis often originates from a localized infection. If the localized infection goes untreated, the infection spreads throughout the bloodstream.
Dr. William Kinnard, an expert in the field of orthopedic surgery, testified that flexion contractures occur when a muscle or muscles become permanently contracted due to prolonged immobility. Dr. Kinnard testified that prolonged immobility and the lack of proper range of motion exercises caused Ms. Batson to develop the flexion contractures. He stated that the contractures could have been prevented had the physicians ordered more frequent and/or aggressive physical therapy and had the physical therapists and nurses performed it. Dr. Kinnard pointed out the physician did not prescribe physical therapy treatment until nearly six weeks after she was admitted to the hospital. The medical records reveal that physical therapy was only performed intermittently, sometimes once a day; sometimes not at all. Although at least one doctor noted the need for more aggressive physical therapy, the pattern continued: therapy was performed either once a day or not at all. Dr. Kinnard further testified, although *955 the critical nature of Ms. Batson's condition could have, at times, necessitated postponing the exercises, the range of motion exercises should have been resumed to maintain mobility and prevent flexion contractures.
Most of the health care professionals who testified agreed that decubitus ulcers result from prolonged pressure to an area of the body. Decubiti are prevented by frequent inspection of the patient's skin for redness and other early signs of breakdown. The witnesses agreed that most decubitus ulcers may be prevented with good skin care and turning and position changes every two hours. Dr. Kinnard and Dr. Raff testified that the development of decubitus ulcers as severe as Ms. Batson's is inexcusable in an ICU setting. Most of the experts who testified at trial concluded that they had never seen such horrendous decubiti and contractures develop in a hospital setting. None of the experts were willing to dismiss Ms. Batson's decubitus ulcers or the flexion contractures as merely a consequence of sepsis. Experts testified that notwithstanding the sepsis, had Ms. Batson been provided proper orthopedic care and physical therapy, she would not have suffered the contractures. Frequent repositioning and rotation by the nurses would have greatly decreased the risk of developing such severe decubitus ulcers. Thus, the trial court's conclusion that three separate and independent acts of negligence occurred is supported by the record. private act when the same circumstances are presented.

Caps Under the MLSSA
In support of its holding that only one statutory cap applies to all injuries under the MLSSA, the court of appeal relied upon this court's decision in Conerly v. State, 97-0871 (La.7/8/98); 714 So.2d 709. In Conerly, there were two claims, a wrongful death claim and a survival action, arising from a single act of malpractice. We held:
[When] there is an act of malpractice causing the death of a patient, and plaintiffs bring survival and wrongful death claims, La. R.S. 40:1299.39 provides there is but one $500,000 cap applicable to all claims.
Id. at 714. In reasoning that only one cap applied, we examined the language of the statute, and found that the legislature intended for the Act to limit the State's liability for one act of malpractice to $500,000.00. In Conerly, we did not address the issue presented here of whether separate caps would apply to separate acts of negligence.
Although this court has discussed the issue of whether more than one cap could apply to multiple acts of malpractice, the issue has never been squarely presented. In Turner v. Massiah, 94-2548 (La.8/30/95); 656 So.2d 636, where two physicians failed to diagnose the plaintiffs breast cancer, we stated:
If the damage or injury could have been divided into two parts, one part caused by one defendant and the other part caused by the other, there would have been, in effect, two injuries. In that case, there having been two torts and two injuries, the question of two caps might have been present. In this case, there were two torts but only one injury.
Id. at 640. We held that the total amount recoverable was $500,000, as the patient suffered but one injury. In dicta, the court favorably discussed Justice Dennis' concurrence/dissent in Stuka v. Fleming, 561 So.2d 1371 (La.1990), cert. denied 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 525 (1990)[3], where he stated:
I am reluctant to conclude that the Fund may never be made to pay more than $400,000 for injuries contributed to by *956 more than one health care provider-tortfeasor. Whether a single limitation applies to damages caused by plural defendants may depend on such factors as whether the defendants engaged in concerted action, whether the damages are severable, or whether the damages may be apportioned between the tortfeasors.
Stuka supra (Dennis, J., concurring in part, dissenting in part).
In Conerly, supra, an infant sustained a severe brain injury and kidney failure at birth, and the parents filed a medical malpractice action, seeking damages for the infant's injuries. When the child died at age four, the parents amended the lawsuit to add two claims, one a survival action and the other a wrongful death claim. The court found there was only one act of malpractice.
In this case, Ms. Batson's injuries can be divided into three major events or injuries: sepsis, decubitus ulcers, and flexion contractures. The sepsis was caused by the physicians' failure to invoke preventative measures and to timely diagnose and treat the sepsis. The decubitus ulcers were caused by the nursing staffs failure to take preventative measures to prevent formation of the ulcers and to timely detect their early development. The flexion contractures were caused by the orthopedic staffs and/ or physical therapists' failure to order and/or perform adequate treatment. Thus, there are three torts, three groups of tortfeasors, and three injuries. This case squarely presents the issue of whether the MLSSA allows for awarding a plaintiff multiple caps for multiple acts of malpractice and separate injuries.
We treat legislation as the solemn expression of legislative will, and therefore, interpretation of a law involves primarily the search for the legislature's intent. LSA-C.C. art. 1; Ruiz v. Oniate, 97-2412 (La.5/19/98); 713 So.2d 442; Hutchinson v. Patel, 93-2156 (La.5/23/94); 637 So.2d 415. When a law is clear and unambiguous and its interpretation does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9; Ruiz, supra, Hutchinson, supra.
Malpractice actions brought against the state in connection with services rendered by state facilities are governed by the MLSSA. The MLSSA was enacted in 1976 to provide that the State of Louisiana would pay any damages awarded in a medical malpractice suit instituted against certain state-employed health-care providers. This court has noted that the Act must be strictly construed because it grants immunity or advantages to special classes in derogation of general rights available to tort victims. See Conerly, supra; Ruiz supra; Kelty v. Brumfield, 93-1142 (La.2/25/94); 633 So.2d 1210, reh'g denied, 93-1142 (La.3/25/94); 635 So.2d 247.
The pertinent language of the MLSSA to the issue presented herein is as follows:
Notwithstanding any other provision of the law to the contrary, no judgment shall be rendered and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged act of malpractice in excess of five hundred thousand dollars plus interest and costs, exclusive of future medical care and related benefits valued in excess of such hundred thousand dollars.
LSA-R.S. 40:1299.39(F).
The legislative intent of LSA-R.S. 40:1299.39 can be gleaned from a careful reading of Sections C and D of the statute. Section C provides:
Since the Louisiana Civil Code was enacted only in the domain of the private law, governs only the legal relationships of private persons among themselves alone, and is inapplicable to public entities and their legal relationships, there is no right nor legal basis ex delicto, or ex quasi-delicto, for an action by a patient or his representative to recover damages or any other losses, including those for the death of the patient, from the state or a state health care provider as defined in this Section as a result of *957 malpractice in connection with state-provided or state-related health care; however, a patient, his representative properly acting for him, or his after-death representative shall have a right to recover from the state certain losses to the extent and within the limitations defined and allowed by this Section of public law due to malpractice as defined in this Section, in the circumstances and within the parameters provided by this Section, on the sole basis of this Section as a special substantive sui generis statutory grant in the domain of public law. This Section shall not be construed to limit, waive, or prohibit claims for lack of informed consent or breach of contract as defined by statutes or otherwise provided by law.
Section D provides, in pertinent part:
(1) Whenever in the same circumstances, but not more than to the same extent, that a patient would, under the private law, including the Louisiana Civil Code, which is applicable only to private persons among themselves alone, be allowed a recovery, due to malpractice, from a private person not employed by nor acting on behalf of a public entity, a patient, his representative properly acting for him, or his after-death representative shall have a right to recover, from the state, losses, including the death of said patient, but only to the degree and within the limits allowed by, and subject to the terms and conditions of, this Section of public law, when and insofar as such losses proximately result from malpractice as defined in this Section ...
Section C makes it clear that because private law is inapplicable to public entities, the legislature enacted the MLSSA to perform the same function for public entities as the private act does for private qualified health care providers. Both acts limit the amount plaintiffs can recover in actions for damages under LSA-C.C. art. 2315 for medical malpractice to the respective caps set forth in those acts.
We hold that the MLSSA does not foreclose the possibility of a plaintiff recovering more than one cap for multiple injuries resulting from multiple acts of malpractice. The MLSSA limits recovery to $500,000.00 for "the injury" for "an alleged act of malpractice." The use of the singular nouns "injury" and "act" denotes that the legislature did not intend to limit a plaintiff to one recovery for multiple injuries resulting from multiple acts of malpractice. The plain language of the Act gives no indication that a plaintiff should be limited to a single recovery of $500,000.00, irrespective of how many acts of malpractice are performed against him or her. The language of LSA-R.S. 40:1299.39(F) should be interpreted to indicate by inference that the total amount recoverable for each act of malpractice shall not exceed $500,000.00. To hold that a plaintiff can only recover one cap regardless of how many times he or she is the victim of malpractice would imply that when a person enters a hospital and is the victim of an initial act of malpractice, all other health care providers have free reign to commit any number of additional negligent acts with full immunity. Clearly, the legislature did not intend such an outrageous result.

DECREE
We find that the MLSSA does not prohibit multiple statutory caps for multiple acts of negligence which produce separate and independent damages. Therefore, we reverse the court of appeal's judgment on that issue and remand this case to the court of appeal to review quantum under each cap.
CALOGERO, C.J., and LEMMON, J., filed concurring opinions.
KIMBALL, J., concurs for the reasons assigned by LEMMON, J.
VICTORY and TRAYLOR, JJ., filed dissenting opinions.
CALOGERO, C.J., Concurring.
I additionally concur and subscribe to Justice Lemmon's concurring opinion. Specifically, I agree with Justice Lemmon *958 regarding the following: 1) his discussion of cause-in-fact and duty/risk; 2) the distinction between the first tortfeasor's liability and the second tortfeasor's liability for sequentially-caused injuries, Weber v. Charity Hosp. of La. at New Orleans, 475 So.2d 1047 (La.1985); 3) the inapplicability of a single statutory cap to two separate and distinct injuries that might give rise to two separate actions, even though the acts occur during the same hospitalization; 4) the strict construction of the special legislation, the $500,000 cap, because the limitation is in derogation of the rights of tort victims; and 5) the content of Justice Lemmon's second footnote, which counters the contention of one of the dissenting justices in this case. I simply add, regarding this latter point, that the majority opinion logically proceeds directly to the only statute before us, the Malpractice Liability for State Services Act, and determines whether that cap applies in this case. The facts and the law in this case do not compel us to address the Medical Malpractice Act, which limits liability for private qualified health care providers, before we address the malpractice act that limits liability for state health care providers. In a case like this, we need not first discuss a multiple cap scenario under the private act simply because both acts similarly limit recovery in the same amount and in the same manner.
LEMMON, J., Concurring.
On a preliminary point, the State mistakenly argues that since the malpractice which caused the sepsis was a cause-infact, from a "but for" viewpoint, of the decubitis ulcers and the flexion contractures, a single $500,000 limitation on recovery for all malpractice-caused injuries should apply. This is not the function of the cause-in-fact inquiry, which is simply one step of the duty-risk analysis for determining the liability of each tortfeasor.
When one tortfeasor causes injuries which are worsened by the second tortfeasor's negligent medical treatment of those injuries, the first tortfeasor is liable for all injuries. Weber v. Charity Hosp. of La. at New Orleans, 475 So.2d 1047 (La.1985). However, the second tortfeasor is only liable for the injuries directly caused by that tortfeasor. The injuries are separable, and a different question of liability is presented for each injury.
In the present case, the original tortfeasor well may be liable for all of plaintiffs injuries that followed in a "but for" fashion, but each subsequent tortfeasor is also liable for the injury he or she caused by separate acts of malpractice. The $500,000 statutory cap is not part of the liability determination in which cause-in-fact plays a role, but rather comes into play in considering limitations on liability.
The key issue in this case is whether the $500,000 limitation applies when the malpractice victim seeks recovery in one action for two (or more) separate and distinct injuries resulting directly from two (or more) separate and unrelated acts of malpractice. La.Rev.Stat. 40:1299.42,[1] while limiting the tort victim's recovery for "all malpractice claims" to $500,000, does not address whether the limitation applies to two separate and unrelated acts of malpractice, by different tortfeasors, resulting in two separate and distinct injuries, that could give rise to two separate actions (even though the acts were during the same hospitalization).[2] A court's deciding the resolution of this unprovided-for situation is in the very nature of the judicial process.
*959 The $500,000 limitation is special legislation in derogation of the rights of tort victims and must be strictly construed against the limitation of damages that otherwise are recoverable. Sewell v. Doctors Hosp., 600 So.2d 577 (La.1992). In the present case, there were three separate and unrelated acts of malpractice committed by three different tortfeasors in three different disciplines, that resulted in three separate and distinct injuries.[3] The limitation, when strictly construed, simply does not apply.
VICTORY, Justice, dissenting.
I am astonished that the majority simply ignores one of the essential issues in this case.
Following our analysis in Conerly, infra, the First Circuit Court of Appeal, in this case, relied upon the following language in the Malpractice Liability for State Services Act (MLSSA) to conclude that recovery under the Medical Malpractice Act (MMA) must be considered in resolving this case:
D.(1) Whenever in the same circumstances, but not more than to the same extent, that a patient would, under the private law, including the Louisiana Civil Code, which is applicable only to private persons among themselves alone, be allowed a recovery, due to malpractice, from a private person not employed by nor acting on behalf of a public entity, a patient, his representative properly acting for him, or his after-death representative shall have a right to recover, from the state, losses including the death of said patient, but only to the degree and within the limits allowed by, and subject to the terms and conditions of, this section of public law....
La.R.S. 40:1299.39. Only fifteen months ago, in Conerly v. State, 97-0871 (La. 7/8/98), 714 So.2d 709, Justice Kimball, writing for the majority of this court, stated,
Additionally, the 1988 amendments added a section which clarified the legislature's intent that a claimant suing under the MLSSA recover only "not more than" to the same extent as one suing under the private law.... Thus, according to this section [section D of the MLSSA], it was the legislature's intent that a claimant suing under the MLSSA should not recover more than a claimant suing under the private act when the same circumstances are presented. The Medical Malpractice Act (MMA) provides that the "total amount recoverable" for "all malpractice claims" for injuries to or death of a patient, exclusive of future medical care and related benefits, shall not exceed $500,000 plus interest and cost. La.R.S. 40:1299.42(B)(1). This provision has been interpreted by Louisiana appellate courts and one federal district court to limit all claims, including those for survival action and wrongful death, by all plaintiffs to $500.000.[citations omitted] Both parties acknowledged that the existing jurisprudence seems to uniformly hold there is but one cap allowed under the MMA. We express no opinion on whether these courts' and the parties' interpretations of the MMA is correct, however, and merely not that La.R.S. 40:1299.39(D) provides that a party be able to recover under the "public act" "not more than to the same extent" that he would be able to recover under the private act.

Id. at 713-14 (emphasis added). Even thought he facts in Conerly are different, it is the analysis that is important. Just as La.R.S. 1299.39(D) required this court in Conerly to examine the MMA, we are now required to examine the MMA to determine whether more than one cap is allowed under the MMA[1] and therefore, the MLSSA.
*960 The majority opinion and the concurring opinion of the Chief Justice clearly miss this holding in Conerly, i.e., the MLSSA states a claimant cannot recover any more than he would be able to recover under the MMA. The majority opinion does not even address this issue and the Chief Justice, concurring, states that "[t]he facts and the law in this case do not compel us to address the Medical Malpractice Act, which limits liability for private health care providers, before we address the malpractice act that limits liability for state health care providers." This statement clearly contradicts the holding in Conerly, How can we possibly determine if the claimant is not recovering more under the MLSSA than the MMA if we do not determine if the claimant is not recovering more under the MLSSA than the MMA if we do not determine the claimant's recovery under the MMA under the same circumstances?
Justice Lemmon's concurring opinion recognizes this holding in Conerly. In footnote 2, his opinion states that the MMA "is applicable to the decision in this case because a malpractice victim cannot recover more under the public act [MLSSA] than a victim suing under the private act [MMA] in similar circumstances [citing Conerly]." However, his opinion gives only a superficial review of the MMA, stating that the MMA does not address whether the limitation applies to two separate acts of malpractice, by different tortfeasors, resulting in two separate injuries. Despite the clear language in the MMA, and without any real analysis, he concludes that the MMA does not restrict the claimant to one cap under the circumstances of this case.
In my view, we are compelled to address and resolve whether the MMA would allow for more than one cap under the circumstances presented here. Since the majority fails to address this issue, I respectfully dissent.
TRAYLOR, J., dissenting
I dissent from the majority's conclusion that LA.REV.STAT. ANN. 40:1299.39(F), which forms a part of the Malpractice Liability for State Services Act ("MLSSA"), allows multiple caps for damages where separate acts of medical negligence result in separate and distinct injuries to a single patient.
The majority quite properly acknowledges the import of subsection (D) of the statute: "Pursuant to [sub] Section D, plaintiffs may bring actions under the MLSSA, and they are entitled to the same remedies as provided under private law for damages caused by malpractice." Batson v. South Louisiana Medical Center, 99-C-0232, Op., at p. 957 (emphasis added). The relevant provisions of subsection (D) provide, inter alia:
(1) Whenever in the same circumstances, but not more than to the same extent, that a patient would, under the private law, including the Louisiana Civil Code, which is applicable only to private persons among themselves alone, be allowed a recovery, due to malpractice, from a private person not employed by nor acting on behalf of a public entity, a patient, his representative properly acting for him, or his after-death representative shall have a right to recover, from the state, losses, including the death of said patient, but only to the degree and within the limits allowed by, and subject to the terms and conditions of, this Section of public law ...
However, after recognizing that persons who are injured through the negligence of state healthcare providers are entitled to the same remedies found in the private act (MMA), the majority holds: "[t]he language of LSA-R.S. 40:1299.39(F) should be interpreted to indicate by inference that the total amount recoverable for each act of malpractice shall not exceed $500,000.00." Id.
*961 A review of the cap language employed by the private act (LA.REV. STAT.ANN. 40:1299.42) indicates an express limitation of liability of $500,000.00 for all medical malpractice claims for injury or death of a patient. In pertinent part, LA.REV.STAT. ANN. 40:1299.42 provides:
B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.

(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient.

(3)(a) Any amount due from a judgment or settlement or from a final award in an arbitration proceeding which is in excess of the total liability of all liable health care providers, as provided in Paragraph (2) of this Subsection, shall be paid from the patient's compensation fund pursuant to the provisions of R.S. 40:1299.44(C).
(b) The total amounts paid in accordance with Paragraphs (2) and (3) of this Subsection shall not exceed the limitation as provided in Paragraph (1) of this Subsection.

(emphasis added).
The cited language of the private act clearly limits the general damage recovery to $500,000.00 for all acts of medical negligence by a private healthcare provider to a single patient. Therefore, there is no remedy in law (damages) beyond the $500,000.00 cap available to injured patients under the private act.
Considering LA.REV.STAT. ANN. 40:1299.39 in its entirety, which is necessary for a proper construct of the statute, it is abundantly clear that subsection (D)(1) was intended to grant the same remedies to persons who bring claims under the MLSSA as those available to persons who are injured by private healthcare providers, including the $500,000.00 cap for general damages for all acts of medical negligence to a single patient. To conclude otherwise is to create an anomaly in the malpractice statutes and to repudiate this court's recent decision in Conerly v. State, 97-0871 (La.7/8/98), 714 So.2d 709, which concluded that, by enacting subsection (D), "it was the legislature's intent that a claimant suing under the MLSSA should not recover more than a claimant suing under the private act when the same circumstances are presented." Id., at 713.
Undeniably, the MLSSA and MMA were enacted to protect the public fisc, while at the same time ensuring that affordable medical care is available to the citizens of this state. The inauguration of a dual system of general damage caps for medical malpractice claims, depending solely on the fortuity of being treated by a state healthcare provider, renders absurd the laudable efforts by the legislature.
NOTES
[*] Marcus, J., not on panel. See Rule IV, Part 2, § 3.
[2] Plaintiffs asserted that SLMC entered into a contractual agreement with Louisiana Physical Therapy and Athletic Rehabilitation, Inc. (LPT & AR), pursuant to which LPT & AR would provide SLMC with physical therapists and rehabilitation services. Plaintiffs further alleged that LPT & AR contracted with Medforce International, Inc. (Medforce International). Under the terms of the contract, Medforce International would provide LPT & AR with inpatient and outpatient physical therapists to perform services at SLMC. Plaintiffs also contended that Robert Rowe (Rowe), a physical therapist, was employed by Medforce International and/or LPT & AR, and that Ms. Batson developed severe complications as a result of the physical therapy services Rowe provided to Ms. Batson during her hospitalization at SLMC. Plaintiffs alleged that LPT & AR and/or Medforce International were vicariously liable for the negligent acts or omissions of Rowe.

Plaintiffs further asserted that Medforce International contracted with Sunbelt Physical Therapy Services (Sunbelt), and under this contract, Sunbelt would provide physical therapists to Medforce International. In turn, Medforce International would use the physical therapists provided to render services at SLMC. Leah Angelito (Angelito), a physical therapist, was employed by Sunbelt, Medforce International, and/or LPT & AR, and she performed physical therapy services on Ms. Batson at SLMC. Plaintiffs further contended that Ms. Batson developed severe complications as a result of physical therapy treatment, or lack thereof, provided by Angelito. Plaintiffs contended that Sunbelt, Medforce International, and/or LPT & AR are vicariously liable for the negligent acts and omissions of Angelito.
Plaintiffs also alleged that SLMC contracted with Medforce Physical Therapy Services to receive physical therapy services. Plaintiffs contended that Ms. Batson developed complications as a result of the actions and inactions of Medforce Physical Therapy Services.
The amended petition also added as defendants Action Temporary Services, Inc. and Temporary Solutions, Inc., alleging that these defendants had merged with Medforce International, Inc.
Thereafter, plaintiffs amended their petition to add St. Paul Fire and Marine Insurance Company (St. Paul) as a defendant, alleging that St. Paul provided a liability insurance policy to Medfore Physical Therapy Services. Plaintiffs also contended that Medforce Physical Therapy Services was vicariously liable for the negligent acts and omissions of Angelito.
[3] Stuka v. Fleming did not involve the issue presented herein. The issue in that case was whether the Patient's Compensation Fund may contest its liability to a medical malpractice victim who has compromised his claim against one health care provider for $100,000, while voluntarily dismissing others, and is seeking recovery against the Fund of damages in excess of the settlement amount.
[1] La.Rev.Stat. 40:1299.42 is part of the private act, but is applicable to the decision in this case because a malpractice victim cannot recover more under the public act than a victim suing under the private act in similar circumstances. Conerly v. State, 97-0871 (La.7/8/98), 714 So.2d 709. However, the holding in Conerly (that only one limitation applies for both survival and wrongful death damages under the private act) certainly does not control the decision in this case.
[2] The limitation applies to limit the malpractice victim's recovery when there is one tortfeasor and one injury, or when there are two or more tortfeasors but only one injury, as in Turner v. Massiah, 94-2548 (La.6/16/95), 656 So.2d 636.
[3] If the tort victim had filed three separate suits under three docket numbers, the cases arguably would not have been consolidated.
[1] The MMA, on this issue, reads as follows:

B.(1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost. [emphasis added]
La.R.S. 40:1299.42.