778 So.2d 54 (2000)
Deborah BATSON, Eula Mae Batson and Billy M. Batson
v.
SOUTH LOUISIANA MEDICAL CENTER and State of Louisiana, Through the Department of Health and Human Resources.
No. 98 CA 0038R.
Court of Appeal of Louisiana, First Circuit.
December 22, 2000.
Rehearing Denied March 6, 2001.
*56 Michael Samanie, Herbert W. Barnes, Houma, for Plaintiffs/Appellees, Deborah Batson, Eula Mae Batson and Billy M. Batson.
Gregory C. Weiss, Kathryne Caraway, New Orleans, for Defendants/Appellants, the State of Louisiana and South Louisiana Medical Center.
Peter Sperling, New Orleans, for Defendants, Medforce Physical Therapy Services, Inc., et al.
Joseph A. Reilly, Jr., Houma, for Defendant, Sunbelt Physical Therapy.
Richard Ieyoub, Baton Rouge, Attorney General on behalf of the State of Louisiana, through the Louisiana Department of Justice.
Amos H. Davis, Baton Rouge, for Defendant, Chicago Insurance Company.
Kristin E. Hendericks, Metairie, for Defendant, Medforce International, Inc.
Before: FOIL, WHIPPLE, FOGG, GUIDRY and PETTIGREW, JJ.
WHIPPLE, J.
This case is before us on remand from the Louisiana Supreme Court with instructions to this court to review damages awarded under the $500,000.00 cap for each of the multiple injuries sustained by plaintiff, Deborah Batson, while hospitalized at South Louisiana Medical Center (SLMC) in Houma, Louisiana.[1] After a thorough review of the extensive record herein, we find no abuse of discretion by the trial court in its award of damages.
With regard to SLMC's claim of entitlement to a credit as the result of a settlement between Ms. Batson and certain defendants, for the reasons discussed more fully below, we pretermit this claim and remand this matter for a determination by the trial court as to whether SLMC is entitled to a credit and, if so, the amount of the credit due.

FACTS AND PROCEDURAL HISTORY
On July 24, 1990, Deborah Batson, a thirty-seven year old woman, was brought to the emergency room at SLMC, with symptoms of vomiting blood and having black, tarry stools. Ms. Batson, who previously had a peptic ulcer condition, was admitted to the hospital for observation and treatment. Ms. Batson's ulcer began bleeding again during her hospitalization on July 26, 1990. Thus, at that time, she underwent a routine surgical procedure known as a Billroth I anastomosis. This procedure involved removing the very end of the stomach and the first portion of the small intestine, where the bleeding was occurring, and surgically reconnecting the remaining portion of the stomach to the intestine. Despite having knowledge that her stomach was filled with old blood and that her stomach acidity was reduced due *57 to the administration of antacids, a situation that allowed for the growth of more bacteria, the treating physicians failed to prescribe antibiotics either pre-operatively or post-operatively to prevent Ms. Batson from developing an infection.
Within hours after surgery, Ms. Batson began to exhibit signs of infection. She developed a fever in excess of 102 degrees, which continued for at least five days, and she also exhibited symptoms of rapid heartbeat and respirations, sweating, restlessness and severe abdominal pain. On July 30, 1990, four days after surgery, Ms. Batson's surgical incision opened up, and purulent drainage began emanating from the wound. It was determined that a leak had developed in the anastomosis, causing fluids from the intestinal tract to leak into the subcutaneous tissues and, ultimately, to escape through Ms. Batson's incisional wound, which led to the development of a fistula. A culture of the drainage from the wound tested positive for e-coli.
On the evening of July 30, 1990, a third-year surgical resident who was treating Ms. Batson ordered intravenous antibiotics. However, his order was not carried out that evening. Moreover, on the following morning, July 31, a first-year surgical resident who was also treating Ms. Batson ordered that the IV antibiotics, which had never been initiated, be discontinued. Thus, it was not until later that day, five days after the onset of Ms. Batson's symptoms of infection, that broad-base antibiotics were ordered and administered.
By the time antibiotics were finally administered, Ms. Batson had developed sepsis, an infection of the blood that one of her treating physicians described as "the most devastating complication that a patient can have." As a result of this life-threatening complication, Ms. Batson went into multi-organ system failure, which continued for most of the six and one-half months she spent in ICU. In the first few days that she was in ICU, she suffered a massive heart attack, and she remained in critical condition and near death for a prolonged period of time thereafter. Ms. Batson was also ventilator-dependent for most of her stay in ICU due to the development of adult respiratory distress syndrome, an additional complication arising from the sepsis.
During her hospitalization, Ms. Batson also developed numerous and extensive decubitus ulcers (bed sores) due to the failure of the nursing staff to reposition her. Many of these wounds did not heal for years after their onset. Ultimately, she had to undergo multiple skin grafting procedures in an attempt to close her wounds and facilitate healing.
Ms. Batson also developed severe flexion contractures of the hips, knees and ankles during her hospitalization at SLMC, literally drawing up into the fetal position. As the record demonstrates, given proper orthopedic care and physical therapy, these flexion contractures were also preventable. Nonetheless, the flexion contractures that Ms. Batson developed during her hospitalization were so severe that they later had to be surgically released through the intervention of doctors elsewhere.
Ms. Batson remained hospitalized at SLMC for eight and one-half months, with six and one-half months spent in ICU. Upon her discharge from SLMC on April 5, 1991, Ms. Batson was transferred to Heritage Manor Nursing Home to receive long-term care for her flexion contractures and decubiti. She remained in the nursing home for nearly two years thereafter. Following her release from the nursing home, Ms. Batson, who had become primarily wheelchair-bound as a result of her injuries, lived with her parents, who were required to assist her in her daily activities.
Ms. Batson and her parents, Eula Mae Batson and Billy Batson, filed suit against SLMC and the State of Louisiana, through the Department of Health and Human Resources, Office of Hospitals, alleging that SLMC's negligence was the cause of her injuries. Plaintiffs later amended their *58 petition to name Louisiana Physical Therapy and Athletic Rehabilitation, Inc. (Louisiana Physical Therapy); Medforce International, Inc.; Medforce Physical Therapy Services, Inc.; Sunbelt Physical Therapy Services, Inc.; Robert Rowe; and Leah Angelito as additional defendants. Plaintiffs alleged that these defendants were jointly and solidarily liable with SLMC for their negligent treatment and substandard care of Ms. Batson, particularly with regard to the flexion contractures.
A four-week trial was held from July 8, 1996, through August 2, 1996. Plaintiffs' claims against SLMC and the State of Louisiana were tried by the bench, and their claims against all remaining defendants were tried by the jury. Following deliberations, the jury found that SLMC, Medforce, Rowe and Angelito were all negligent in their treatment of Ms. Batson and accordingly were liable for damages relative to her flexion contractures.[2] SLMC was found to be 90% at fault, Medforce 9.7% at fault, Rowe 0.2% at fault, and Angelito 0.1% at fault. For the flexion contractures, the jury awarded the following sums: 1) past medical expenses, $536,949.91; 2) future medical expenses, $1,000,000.00; 3) physical pain and suffering, past and future, $50,000.00; and 4) mental pain and suffering, past and future, $50,000.00.
With regard to the claims against SLMC and the State, the trial court specifically determined that SLMC had breached the standard of care in its treatment of Ms. Batson and that this negligence was the legal cause of Ms. Batson's injuries. The trial court further found that the (1) sepsis and related injuries, (2) flexion contractures and (3) decubitus ulcers were separate and unrelated injuries resulting from independent acts of negligence. Therefore, the trial court determined that a separate $500,000.00 cap on damages as set forth in LSA-R.S. 40:1299.39(F) of the Medical Liability for State Services Act (MLSSA) applied to each independent act of negligence causing a separate and independent injury.
The trial court found SLMC to be 100% at fault in causing Ms. Batson's sepsis and related injuries and awarded damages as follows: $249,791.03 for past medical expenses; $87,049.75 for future medical expenses; and $500,000.00 for all other general and special damages. The trial court also found SLMC 60% at fault in causing Ms. Batson's flexion contractures and awarded her $322,169.95 for past medical expenses; $900,000.00 for future medical expenses; and $500,000.00 for all other damages. The court further found SLMC 70% at fault in causing Ms. Batson's decubitus ulcers and awarded her $78,352.36 for past medical expenses; $70,000.00 for future medical expenses; and $500,000.00 in general damages.
On appeal, a prior panel of this court, while finding no error in the trial court's determination that the cap on damages under the MLSSA was constitutional, nonetheless disagreed with the trial court's conclusion that the MLSSA allowed for multiple caps in this case. Thus, the portion of the trial court's judgment that had allowed multiple caps under the MLSSA was reversed, based upon the panel's conclusion that one $500,000.00 cap applied to all of plaintiffs' injuries and claims. The trial court's judgment was affirmed in all other aspects. Batson v. South Louisiana Medical Center (Batson I), 98-0038, pp. 9-17 (La.App. 1st Cir.12/28/98), 727 So.2d 613, 617-621.
On plaintiffs' application for writs of certiorari and review, the Louisiana Supreme Court reversed the ruling that Ms. Batson was only entitled to one cap under the MLSSA. Batson v. South Louisiana Medical Center (Batson II), 99-0232, p. 1 (La.11/19/99), 750 So.2d 949, 951. The Court specifically held that the MLSSA does not prohibit multiple statutory caps *59 for multiple acts of negligence which produce separate and independent damages. Batson II, 99-0232 at p. 11, 750 So.2d at 957. The Supreme Court then remanded the matter to this court with instructions to "review quantum under each cap."[3]Batson II, 99-0232 at p. 11, 750 So.2d at 957.

REVIEW OF DAMAGE AWARDS
The trier of fact is accorded much discretion in fixing general damage awards. LSA-C.C. art. 2324.1; Cheramie v. Horst, 93-1168, p. 6 (La.App. 1st Cir.5/20/94), 637 So.2d 720, 723. The discretion vested in the trier of fact is great, "even vast," so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Youn, 623 So.2d at 1260. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Youn, 623 So.2d at 1261.
If the appellate court finds from the record that the trier of fact abused its discretion in awarding damages, the award may be disturbed only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded the trier of fact. Bosworth v. Authement, 634 So.2d 1205, 1207 (La.App. 1st Cir.1993), writ denied, 94-0002 (La.3/11/94), 634 So.2d 836.

Sepsis and Related Injuries
The initial injury suffered by Ms. Batson in this case was the development of sepsis, an infection of the blood that affects every organ and all the tissues of the body, which led to a multitude of other complications. SLMC and the State were found to be 100% at fault in causing the sepsis and related injuries.
In awarding damages for this claim, the trial court specifically noted that Ms. Batson's general damages for this claim exceeded $500,000.00. The court further found that Ms. Batson had suffered past lost wages of $30,000.00 and future loss of earning capacity of $200,000.00 as a result of the sepsis. Thus, the trial court awarded Ms. Batson $500,000.00 (the cap) in general and special damages for this claim. On review, we find no error.
*60 A review of the record as a whole demonstrates the profound suffering Ms. Batson experienced as a result of the sepsis and resulting complications.[4]
As stated above, shortly after the Billroth I procedure, Ms. Batson began "spiking" a temperature in excess of 102 degrees and exhibiting rapid heart rate and respirations. She also began experiencing severe abdominal pain. By the fourth day post-operatively, Ms. Batson developed purulent drainage, emanating from her wound, and was "very hyperactive," sweating, nervous and in pain. On the following morning, Ms. Batson's treating physicians re-opened the incisional wound down to the abdominal wall, in an attempt to drain the infection.
However, by the time the doctors finally realized that Ms. Batson was suffering from more than a simple wound infection, her unchecked septic condition resulted in an "overwhelming infection," which her physicians conceded was life-threatening. Although she was only thirty-seven years old, she soon began experiencing multiorgan system failure and was placed in ICU, where she remained for six and one-half months, fighting for her life.
The infection in the bloodstream was circulated throughout her body, resulting in profound damage to her organs, tissues and blood vessels. As a result of the damage to her blood vessels, all the veins in her body became "maximally dilated," meaning that they were no longer able to constrict. Accordingly, the blood vessels of her circulatory system leaked fluids into the tissues of her body, causing her to become extremely edematous or swollen. Because of the edema, extensive painful blisters developed on Ms. Batson's skin, with fluid "literally weep[ing]" out of the blisters.
As the capillaries in her lungs began to leak, fluid began to build up in the lung tissue itself. This fluid build-up resulted in Ms. Batson developing adult respiratory distress syndrome (ARDS), a dangerous condition that is often fatal. As a result, Ms. Batson was unable to breathe on her own, because the effort was too great. Thus, Ms. Batson quickly became ventilator-dependent. She also lost her ability to eat and required intravenous nutrition. She also was placed in physical restraints, which became necessary to prevent her from accidentally removing vital tubes in her confused and agitated state.
As stated above, within a few days of her transfer from a general medical floor to the ICU, Ms. Batson suffered a massive heart attack. Throughout the time she remained in ICU, she had great difficulty maintaining blood pressure, which often dropped perilously low. Consequently, Ms. Batson required a constant regimen of medications to generate and support her blood pressure.
With regard to the fistula that developed as a result of the leak in the anastomosis, her treating physicians opted to treat the wound with antibiotics and wait for the intestinal leak to seal itself, rather than attempting to repair the leak surgically. This open wound drained copious amounts of discharge for many months, sometimes generating as much as one-half gallon per day. The drainage was described variously as bloody, bilious or greenish. On one occasion, it was noted that the drainage looked like "coffee ground[s]," which the physician opined was possibly feces or fecal matter draining through the patient's wound. As the record shows, it was not until February of 1991 that the fistula finally appeared to be closing.
Commencing in her early months in ICU, Ms. Batson also began to bleed from *61 the bowel. The physicians determined that, because of prolonged use of antibiotics, she had developed pseudo-membranous colitis, a potentially fatal condition. As a result, she required multiple transfusions of blood products in order to sustain her blood volume.
In addition to these complications, the sepsis also resulted in Ms. Batson suffering brain damage. While in ICU, she suffered a tonic clonic seizure, a seizure that is close in scale to a grand mal seizure and is indicative of brain dysfunction. Ms. Batson also had other generalized seizures. Dr. William Black, a neuropsychologist who examined Ms. Batson after her release from SLMC, testified that as a result of the sepsis, Ms. Batson demonstrated multiple cognitive deficits in many areas, indicative of right-hemisphere dysfunction. These cognitive deficits also were readily apparent to Dr. Christopher Cenac, an orthopedic surgeon, when he examined Ms. Batson for a consult in connection with this litigation in December of 1995. He, likewise, concluded that Ms. Batson, who had previously worked as a medical transcriptionist, had suffered a loss in all high-level cognitive abilities. Dr. Black opined that it was "absolutely clear" that the pattern of neuropsychological deficits from which Ms. Batson suffered would cause her a "significant disability" in any attempt to return to work.
The prolonged use of the antibiotics needed to fight the infection in Ms. Batson's blood also resulted in her suffering a significant hearing loss. Testing revealed that she sustained a 53% hearing loss in the right ear and a 58% hearing loss in the left ear. Ultimately, she had to be fitted with bilateral hearing aids.
Ms. Batson's condition had also required the use of a Foley catheter for most of the six and one-half months that she was in ICU. As a result of this prolonged use of the catheter, she developed urinary incontinence. Additionally, because of her prolonged period of bed rest, she also developed diffuse osteoporosis, a loss of calcium from the boney structures.
As an additional result of the sepsis, she developed hypersplenism. The damage to her splenal vein caused her spleen to grow at an abnormal rate over a period of time and to become overactive. Her overactive spleen resulted in the destruction of her blood platelets, which, in turn, caused her to bleed very easily.
The physicians who later treated her concluded that the only way to correct her low platelet count was to remove her spleen; however, given her overall condition, Dr. Russell Henry, a specialist in internal medicine, who became her treating physician after her discharge from SLMC, concluded that the required spleen surgery would be "very risky" and "fraught with extensive bleeding." Nonetheless, Dr. Henry eventually concluded that Ms. Batson would not be able to undergo any of the other medically-necessary surgical procedures (such as surgery to correct the flexion contractures) unless her low platelet count could be corrected.
Thus, Dr. Victor Tedesco performed a splenectomy on Ms. Batson on November 3, 1993, at Terrebonne General Medical Center. Initially, Ms. Batson did well following the surgery, with a rapid rise in her platelet count. However, she later developed two complications following this surgery. First, she developed a "very brisk" upper GI hemorrhage, causing her to go into shock and requiring significant transfusions of blood for resuscitation. Secondly, she developed a sub-diaphragmatic abscess. The abscess had to be surgically drained through an incision behind the chest wall. A chest tube was then inserted to facilitate further drainage. Ms. Batson was finally discharged from the hospital following the splenectomy on November 23, 1993, three weeks after the surgery was performed.
Additionally, at some point after the onset of sepsis, Ms. Batson developed persistent vaginal bleeding, and began passing large clots. This problem was also attributed *62 to the complications following the Billroth I procedure. Initially, Dr. Henry thought this problem was a manifestation of the low platelet count. However, after Ms. Batson underwent the splenectomy, the vaginal bleeding continued. Thus, Ms. Batson also required treatment by Dr. Gerald Joseph, Jr., a gynecologist at Ochsner Foundation Hospital.
Dr. Joseph initially attempted to control the bleeding with medication; however, those attempts were unsuccessful. Consequently, on April 5, 1995, Dr. Joseph performed an endometrial ablation, a surgical procedure that essentially destroyed the lining of her uterus, in an attempt to stop the persistent bleeding. Dr. Joseph described the surgical procedure as "just the most difficult thing in the world," because Ms. Batson's flexion contractures caused significant problems with visualization. Because of his difficulty in positioning Ms. Batson due to her flexion contractures, and the resulting difficulty in visualizing the affected area during the surgery, Dr. Joseph inadvertently perforated her uterus with a probe during the procedure. At that point, Dr. Joseph opted to discontinue the procedure. Dr. Joseph candidly acknowledged that the attempted endometrial ablation ultimately was unsuccessful, and that Ms. Batson continued to have persistent irregular bleeding.
Regarding her condition as of the time of trial, Dr. Henry stated that Ms. Batson would be prone to future complications and infections due to the dilated veins in the esophagus and stomach. He further stated that Ms. Batson would have to continue taking the medication Propanolol, to prevent more episodes of upper GI hemorrhaging in the veins damaged by the sepsis.
Considering the multitude of complications and the degree of resulting pain suffered by Ms. Batson, and based upon our review of the record as a whole, suffice it to say we find no abuse of discretion in the trial court's award of $500,000.00 in general and special damages for the sepsis and the related injuries.

Decubitus Ulcers
As stated above, Ms. Batson also developed numerous decubitus ulcers (bed sores) during her hospitalization due to the neglect of the nursing staff and their failure to regularly reposition her. SLMC and the State were found to be 70% at fault in causing Ms. Batson's decubitus ulcers and the damages resulting therefrom. In awarding damages, the trial court found that, even reducing the damage award by the percentage of fault not attributable to SLMC and the State, Ms. Batson's general damages clearly exceeded the $500,000.00 cap. Accordingly, the trial court awarded Ms. Batson $500,000.00 in general damages for this claim. On review, we find no error in this determination.
During her stay at SLMC, Ms. Batson developed extensive decubiti on the back of her head, the scapula on one side of her back, both elbows, her sacrum, both hips, both knees, one calf and both heels and ankles. As established in the record, with proper skin care and repositioning of a patient at regular intervals, decubitus ulcers are usually preventable. Dr. Martin Raff, an internal medicine specialist, described Ms. Batson's decubitus ulcers as "beyond any explainable rationale" and "really horrendous," stating that he had not seen decubitus ulcers as severe as Ms. Batson's "under any circumstances."
As set forth in the testimony of Annette Windham, a registered nurse certified in critical care, there are four stages of decubitus ulcers: stage one, where there is a red spot on the skin; stage two, where the skin begins to blister; stage three, where there is breakdown into the muscle; and stage four, where the breakdown extends to the bone. The evidence of record demonstrates that Ms. Batson suffered from stage three and four decubiti over the length of her body. The evidence also demonstrates in overwhelming detail the *63 profound pain and suffering Ms. Batson obviously experienced as a result of the ulcers she developed.
As acknowledged by (at least) one of the ICU nurses charged with Ms. Batson's care, at one point during her ICU stay, Ms. Batson's sacral decubitus ulcer alone measured over ten inches in diameter and involved decay that went down to the bone, with Ms. Batson's coccyx bone openly exposed. The presence of stool in the area from Ms. Batson's frequent, liquid bowel movements significantly irritated this ulcer and exacerbated the problem.
Additionally, while bathing Ms. Batson one. day, one of the ICU nurses "discovered" a "huge" decubitus ulcer on the back of Ms. Batson's head. With regard to treatment of the ulcer after it finally was noticed, the nurse in question stated that because Ms. Batson's hair was "mat[ted]," they "couldn't do a whole lot with it." Eventually, a nurse contacted Ms. Batson's family and obtained permission to cut Ms. Batson's hair so that the ulcer could be properly cleaned and cared for.
The immense pain and suffering experienced by Ms. Batson from even routine cleansing of her decubiti is also graphically evident throughout the record. In particular, in a videotape of a procedure filmed on December 21, 1991, at Heritage Manor Nursing Home, even with the naked eye, the decubitus ulcer on her hip appears to be approximately three inches wide. While cleaning this ulcer, the nurse was able (and required) to insert a medical cotton swab (an industrial-sized Q-tip) at least one to one and one-half inches into the open wound.
Despite Ms. Batson's best efforts to maintain her composure during these procedures, it is obvious that these episodes were extremely painful and that she experienced acute distress throughout the cleaning of these festering wounds. During the incident depicted on the videotape, Ms. Batson, crying out in pain, attempted to physically restrain the nurse from continuing the procedure and had to be consoled by a family member.[5] As the tape shows, even after the cleansing procedure was complete, her pain persisted despite the best efforts of the nursing home attendant to make her comfortable. Ms. Batson had to undergo these cleansing procedures on a daily basis for more than five years. Notably, at least one of the decubiti lingered even up until the time of trial.
Ms. Batson was also required to undergo periodic debridement of the decubiti to remove dead flesh surrounding the ulcers. These exceedingly painful procedures involved cutting away necrotic tissue. As noted in the record, Ms. Batson was administered "heavy duty narcotics" during her hospitalization for the pain she suffered from decubitus ulcers. However, one of her treating physicians acknowledged that even with the narcotics, Ms. Batson still suffered "excruciating pain."
Eventually, in 1994, Ms. Batson came under the care of Dr. O'Neil Engeron, a plastic surgeon, for treatment of her chronic decubiti. Dr. Engeron began treating the decubiti with debridement and attempted pigskin grafting in October of 1995. However, with regard to the large ulcer on her left heel, the treatments utilized were unsuccessful, and the decubitus ulcer recurred.
In March of 1996, Dr. Engeron excised the large decubitus ulcer on Ms. Batson's left heel and applied a split-thickness skin graft harvested from her left thigh. Unfortunately, over the course of the next three weeks, the skin graft slowly dissolved until it entirely disappeared. Shortly before trial of this matter, Ms. *64 Batson was placed in a device called an Unna boot to facilitate healing of the ulcer, and the size of this ulcer appeared to be decreasing gradually.
Finally, in addition to the immense physical suffering Ms. Batson endured from the decubitus ulcers, the record shows she sustained severe scarring at the sites of the various decubiti.
On review, considering the record herein, we again find no abuse of discretion in the trial court's award of $500,000.00 in general damages against SLMC and the State for these injuries.

Flexion Contractures
During her hospital stay, Ms. Batson also suffered severe flexion contractures, which rendered her totally disabled upon discharge from SLMC. The record clearly establishes that the contractures were the result of inadequate orthopedic care and virtually non-existent physical therapy. SLMC and the State were found to be 60% at fault in causing these injuries. In awarding damages for this claim, the trial court again specifically found that, even reducing the award by the percentage of fault not attributable to SLMC and the State, Ms. Batson's general damages still exceeded $500,000.00. The court further found that Ms. Batson had suffered past lost wages of $120,000.00 and loss of future earning capacity of $500,000.00 as a result of the neglect resulting in the development of the flexion contractures. Accordingly, the trial court awarded Ms. Batson the $500,000.00 statutory cap in general and special damages for this claim. On review, we find no error.
As the record indicates, when a patient lies immobile for a long period of time, the limbs will "draw in." In the absence of proper physical therapy and orthopedic care, the limbs will become fixed in that position because the tendons become contracted and scarred, and a contracture develops. With proper care, however, flexion contractures are preventable. However, once they develop, the contractures can become permanent if steps are not immediately taken to correct the problem. After a period of time, no amount of physical therapy will correct the contracture, and the patient must submit to surgical release in order for the limb to be straightened.
In the instant case, in February of 1991, Dr. Ira Woodstein, an orthopedic surgeon at SLMC, examined Ms. Batson and determined that she had developed thirty-five-degree contractures of the hips and ninety-degree flexion contractures of the knees, which were characterized as "severe contractures." With regard to the severity of these flexion contractures, Dr. Raff testified for trial that he "might expect that in a homeless person who's been lying in the street somewhere, but not in an intensive care unit." As his testimony indicates, contractures of this degree are inexcusable in a hospital setting.
As the record demonstrates, although Dr. Woodstein ordered physical therapy twice a day for Ms. Batson after she came under his care, this order was not carried out. He also ordered that a dynasplint be applied to her right knee for six to eight hours each morning in an attempt to stretch out her knee tendons. Dr. Woodstein candidly acknowledged that the dynasplint caused tremendous pain, that this treatment brought her to tears, and that at times she screamed out in pain while the dynasplint was in place. Nonetheless, he believed that he initially made some progress in reducing the severity of the flexion contractures in the right knee.
However, on March 31, 1999, when visiting Ms. Batson in her room, Dr. Woodstein discovered that the dynasplint remained in place and had been left on in error by the nursing staff for a period of twenty-one hours, rather than the eight hours ordered. He noted that Ms. Batson was in agony, and documented that the knee flexion contracture had increased due to the severe spasm caused by the extended use of the splint. This caused a total regression *65 in any progress made by Dr. Woodstein in his treatment of Ms. Batson's contractures.
After allowing her knee to rest for twenty-four hours, Dr. Woodstein reinstituted the dynasplint therapy, which was continued until Ms. Batson's discharge from SLMC on April 4, 1991. Nonetheless, measurements of her contractures one week after her discharge demonstrated that she still had ninety-degree flexion contractures of the knees, and that ultimately, the dynasplint therapy had not been successful.
Upon her release from SLMC, Ms. Batson was unable to walk or even lift herself out of bed. Moreover, she suffered excruciating pain attributable to the contractures each time she was lifted out of bed by the nursing staff.
After being transferred from SLMC to Heritage Manor Nursing Home, Ms. Batson underwent extensive rehabilitative efforts through physical therapy. Nonetheless, despite these painful and exhausting efforts, Ms. Batson's contractures showed little improvement, and it became apparent that surgical release of the contractures would be necessary.
In March of 1993, Ms. Batson was examined by Dr. William Kinnard, an orthopedic surgeon, who noted that she had "quite severe," fixed flexion contractures of the hips, knees and ankles, with very limited range of motion. Dr. Kinnard ultimately performed surgery at Terrebonne General Medical Center to correct these contractures. He performed bilateral posterior capsular release and tenoplasty on the knees on May 2, 1994; bilateral hip flexor and adductor releases on June 27, 1995; and right ankle contracture release on July 3, 1995. These "very complex" and "extensive" procedures involved cutting the contracted tendons in a manner to gain length in the tendon, straightening the joint and suturing the tendons back together.
Following the hip and ankle releases, Ms. Batson was placed in a body cast for approximately two weeks. Thereafter, she was placed in a brace for eight weeks. She was then transferred to a rehabilitation unit at Terrebonne General Medical Center, where she remained until October of 1995.
With regard to the surgical outcome, Dr. Kinnard characterized the surgeries as successful, but he noted that he had been unable to get Ms. Batson back to a "normal position." However, the surgeries resulted in Ms. Batson being in a "much straighter position." These contracture releases ultimately allowed Ms. Batson to progress from a situation where she was only able to sit in a wheelchair to a situation where, over time and with extreme effort, she was able to walk with assistance to a very limited degree.
With regard to her ability to walk, Dr. Kinnard explained that Ms. Batson had become what is termed a "functional ambulator," meaning that during therapy she could get up with either a walker or parallel bars. He testified that at best, Ms. Batson could only take a limited amount of steps, such as to get from a chair to a bed, for example. He noted that she would not be able to "get up from a chair and walk across the room and change the station on the TV" or shop for groceries. As Dr. Kinnard explained, the minimal "walking" that Ms. Batson was capable of doing consumed her energy and was exhausting to her. Thus, he concluded that Ms. Batson would continue to be primarily wheelchair-bound for the remainder of her life.
With regard to her ability to return to work, Dr. Kinnard opined that Ms. Batson's contractures had "eliminated that ability." Similarly, Ken Barrilleaux, one of the physical therapists who worked extensively with Ms. Batson after her discharge from SLMC, testified that he did not believe that Ms. Batson would ever be able to return to any gainful employment.
Dr. Douglas Womack, an economist, testified as to the loss of earnings suffered by *66 Ms. Batson. Based on Ms. Batson's employment as a medical transcriptionist prior to these injuries, Dr. Womack calculated her past wage loss as of the date of trial to be $101,995.00. He further calculated her loss of future earning capacity to be $246,204.00.
Additionally, because of Ms. Batson's limited ability to maneuver herself, she required assistance in many daily activities. Nathaniel Fentress, a rehabilitation counselor who provides services to impaired and disabled patients, prepared a life care plan for Ms. Batson, setting forth the cost of the assistance she would need in the future. He calculated that the total cost of equipment and personal assistance for her care would range from $2,297,931.39 to $4,180,833.39, depending on the extent of personal assistance she would require.
Considering the record herein, and the degree of suffering and resulting disability that Ms. Batson sustained as a result of the flexion contractures, we again find no abuse of the trial court's discretion in its award of $500,000.00 in general and special damages.

SLMC'S CONTENTION THAT ANY JUDGMENT HAS BEEN FULLY SATISFIED
In its brief to this court on remand, SLMC and the State now argue that they are entitled to judgment in their favor setting forth that they owe plaintiffs nothing because judgment herein has been fully satisfied. SLMC and the State contend that they are entitled to judgment in their favor based upon a payment of $1,636,949.91 in settlement by Robert Rowe, Leah Angelito and Medforce Physical Therapy Services, Inc. ("the physical therapy defendants"), whom SLMC and the State contend were state qualified health care providers.[6] SLMC and the State argue that Ms. Batson was only entitled to recover $1,500,000.00 in total damages from all qualified state health care providers, representing one "cap" for each claim. Thus, they contend that, because the amount paid in settlement by some of the physical therapy defendants exceeded all three caps to which Ms. Batson was entitled, SLMC and the State have no further liability to her under the judgment rendered by the trial court.
At the outset, we note that while SLMC and the State raised in their brief and at oral argument on appeal that they owe nothing to Ms. Batson, by virtue of this credit they claim in their favor, our review of the record reflects that the issue of any credit due was never raised or fully addressed at the trial court level.
Moreover, we find no merit to the attenuated claim by SLMC and the State that such a credit, even if available to them, would apply to all three malpractice claims herein, i.e., the claims resulting from the acts of malpractice giving rise to Ms. Batson's flexion contractures, the acts of malpractice resulting in Ms. Batson's sepsis and related injuries, and the acts of malpractice resulting in Ms. Batson's decubitus ulcers. Specifically, we note that the settlement by the physical therapy defendants involved the claim for flexion contractures, in that these defendants were only found to have been at fault in causing this particular injury to Ms. Batson. Thus, as a matter of law, there is simply no basis for granting SLMC and the State a credit from those *67 settlement proceeds against the remaining two malpractice claims. To do so would circumvent the Supreme Court's clear pronouncement that Ms. Batson had established multiple, separate claims against SLMC and the State, thus entitling her to multiple caps. Batson II, 99-0232 at p. 11, 750 So.2d at 957.
Additionally, with regard to whether SLMC and the State should be given a credit against their liability to Ms. Batson for the flexion contractures claim, we find that this issue is dependent upon certain inherent factual determinations that cannot be discerned from the record before us and are more appropriately addressed at the trial court level. In particular, initially, there must be a determination of whether the physical therapy defendants actually were qualified "state health care providers." LSA-R.S. 40:1299.39(A)(1)(a). We disagree with the assertions by SLMC and the State that this issue was clearly decided by the trial court, with the trial court finding that physical therapy defendants Rowe and Angelito were in fact qualified state health care providers.
The "ruling" upon which SLMC and the State rely was apparently a ruling on a pretrial motion filed by plaintiffs, made by the trial court on the first day of trial with regard to the threshold admissibility of certain documents, including "certificates," obtained shortly before trial, which the State and SLMC contended were admissible as evidence that Robert Rowe and Leah Angelito were qualified state health care providers. The court concluded that the certificates were in fact admissible, but stated as follows:
I believe that the certificates should go in in this particular case and let me I haveI spent a great deal of time looking at the statutes and one of the obviously one of the problems that is there in connection with the procedures and the testimony we had, we have someone who issues certificates. There was certainlywell, the testimony was clear that Miss Shink [sic] did not at all times understand the procedures to be used. She used whatever procedures and guidelines that she has and the instruction she had while certainly of a very skimpy or limited nature, while the framework that is set up within the statute, the possible lack of procedural guidelines, while those may raise certain constitutional questions, I do not feel that the statute as set forth prohibits the issuance of a certificate under those particular guidelines. I think basically what you have is, is that there's nothing that says the certificates should not have been issued and that's, that's the problem that the Court had. I had problems with the way and the procedures that were used and the lack of substance or other I guess protective procedures that were present. But under the statute the Court does feel that the, that these particular parties were qualified health care providers that certificates were issued and they jury [sic] should know that.
While the court did state that it "felt" that these defendants were qualified health care providers, the court was apparently only being asked to rule on the question of the threshold admissibility of the certificates. Importantly, the court then went on to note that "y'all may want to address as to what extent the jury can be advised and shown as to the procedures that were used and how a person obtains a certificate. That's another issue." (Emphasis added).
Thus, contrary to the assertions by SLMC and the State, we conclude that the court, in its ruling on the threshold admissibility of the certificates, did not make a final determination that these defendants were in fact qualified state health care providers who were covered by the MLSSA for the instant claims.[7]
*68 We further note, pursuant to LSA-R.S. 40:1299.39(A)(1)(a)(iv)(cc), an individual will not be considered a qualified state health care provider and thus will not be entitled to protection under the MLSSA if that individual's action constituted gross negligence or any willful or wanton act. This issue, which obviously may be pertinent in this case, has never been addressed by the trial court.
Considering the foregoing, as well as the limited scope of the Supreme Court's remand to this court, we conclude that the issue of whether SLMC and the State are entitled to a credit on the flexion contractures claim involve determinations that must be made by the trial court following an evidentiary hearing. Therefore, while we are sensitive to the protracted procedural history of this litigation, we find a remand is necessary herein. Accordingly, we remand this matter to the trial court for the limited purpose of determining whether SLMC and the State are entitled to a credit on the flexion contractures claim, and, if so, the amount of the credit.[8]

DECREE
For the above and foregoing reasons, the trial court's awards of damages to Ms. Batson for claims arising from the acts of malpractice resulting in Ms. Batson's flexion contractures, the acts of malpractice resulting in Ms. Batson's sepsis and related injuries, and the acts of malpractice resulting in Ms. Batson's decubitus ulcers *69 are affirmed. Thus, SLMC and the State are liable to Ms. Batson for the $500,000.00 damage award for claims arising from the sepsis and resulting injuries and for the $500,000.00 damage award arising from claims for the decubitus ulcers.
This matter is remanded to the trial court for the limited purpose of determining whether Robert Rowe, Leah Angelito and Medforce Physical Therapy Services, Inc. were qualified state health care providers under the MLSSA and, consequently, whether SLMC and the State are entitled to a credit against the amount SLMC and the State would otherwise owe for her flexion contractures claim, absent the settlement between Ms. Batson and these defendants. Costs of this appeal in the amount of $23,711.70 are hereby assessed against defendants, the State of Louisiana and South Louisiana Medical Center.
AFFIRMED IN PART AND REMANDED.
FOIL, J., concurs in part and dissents in part for the reasons set forth by GUIDRY, J.
GUIDRY, J., concurs in part, dissents in part and assigns reasons.
GUIDRY, J., concurring in part and dissenting in part.
I dissent from that portion of the majority's opinion that remands this case to the trial court for the litigation of issues that, in my opinion, have already been resolved.
Pursuant to La. R.S. 40:1299.39(F), the plaintiff is only entitled to recover $500,000.00 plus interest and costs, exclusive of future medical care and related benefits in excess of the $500,000.00, for an injury caused by an act of medical malpractice. In other words, the plaintiff is limited to a total of $500,000.00 for an injury from all defendants that "qualify" under the Malpractice Liability For State Services Act. The record reflects that the trial court ruled that the physical therapist defendants, specifically Louisiana Physical Therapy & Athletic Rehabilitation, Inc., Robert Rowe, and Leah Angelito, were state qualified health care providers. This ruling has not been assigned as error on appeal. Thus, with respect to the flexion contractures, the plaintiff has already recovered more than the statutory cap; the statutory cap awarded by the trial court for this aspect of the plaintiff's damages has been satisfied.
The State, however, argues that the plaintiff has recovered all damages the plaintiff is entitled to recover for Ms. Batson's three separate medical malpractice claims because she has recovered $1,636,949.91 plus interest and costs from the physical therapist defendants as the result of their settlement. However, the physical therapist defendants were only found to be at fault with respect to one of Ms. Batson's three separate injuries, the flexion contractures. The trial court award for flexion contractures was: $322,169.95 for past medical expenses; $900,000.00 for future medical expenses; and $500,000.00 for all other general and special damages (for a total of $1,722,169.95). Thus, the settlement only covered that aspect of Ms. Batson's injuries. The plaintiff is still entitled to recover the remaining damages for the other two separate aspects of Ms. Batson's injuries: (1) sepsis, hearing loss, brain injury, and incontinence; and (2) decubitus ulcers.
Therefore, the trial court's judgment in favor of plaintiff and against SLMC and the State of Louisiana, through the Department of Health and Human Resources (collectively appellants), should be amended to allow a credit in favor of SLMC and the State of Louisiana for the settlement Ms. Batson received from the physical therapist defendants with respect to the flexion contractures. In all other respects, the trial court's judgment should be affirmed and SLMC and the State of Louisiana should be held responsible for payment of the damages awarded for the other two separate aspects of Ms. Batson's injuries.
*70 As to all other aspects of the opinion, I respectfully concur.
NOTES
[1] We note that Deborah Batson died on December 22, 1999. A motion to substitute her father, Billy M. Batson, as party plaintiff was filed with this court on April 6, 2000, and granted on April 18, 2000.
[2] The jury found that neither Louisiana Physical Therapy nor Sunbelt Physical Therapy Services, Inc. were at fault in causing Ms. Batson's injuries.
[3] We note at the outset that, in its original appeal to this court, SLMC and the State did not specifically challenge the actual amount of general damages awarded to Ms. Batson for each of her three separate injuries. Rather, they assigned as error the trial court's determination that more than one cap applied and its assessment of general damages against SLMC when plaintiffs allegedly had already received an amount in excess of any statutory caps from certain settling defendants. The only assignment of error that specifically challenged the actual quantum awarded was their argument that the trial court erred in awarding a specific sum for future medicals, an issue previously addressed by this court in Batson I, 98-0038 at p. 13, 727 So.2d at 619, which was not disturbed by the Supreme Court in Batson II, 99-0232 at p. 5, 750 So.2d at 953.

Moreover, although plaintiffs answered the appeal and assigned as error the alleged insufficiency of quantum awarded, they essentially argued that the MLSSA was unconstitutional and that, upon a finding of its unconstitutionality, plaintiffs were entitled to recover their full damages, not subject to any cap. The constitutionality of the MLSSA was also addressed by this court in Batson I, 98-0038 at pp. 13-17, 727 So.2d at 619-621.
Nonetheless, because we have been instructed on remand to "review quantum under each cap," we conclude our mandate is to conduct a full quantum review accordingly.
[4] The record in this matter consists of approximately 4,000 pages contained in 15 record volumes, plus 3 large boxes containing exhibits, depositions and related documentary evidence. Given the multitude of complications Ms. Batson suffered as a result of the sepsis, this opinion does not purport to individually address each one. Rather, we have outlined some of the more significant problems Ms. Batson experienced.
[5] Although some of the nurses who originally were responsible for her care at SLMC attempted to lessen the impact of the testimony and evidence stating that she had a low tolerance for pain, these comments seem callous and inaccurate considering the nature, depth and extent of the wounds she developed and the pain obviously endured by the patient even in the simple act of cleansing of these oozing wounds.
[6] During the trial of this matter, plaintiffs entered into a high-low settlement agreement with Medforce Physical Therapy Services, Inc.; Louisiana Physical Therapy and Athletic Rehabilitation, Inc., Mr. Rowe and Ms. Angelito. According to the agreement, a low-end amount of $750,000.00 would be paid if the jury returned a verdict less than $750,000.00, even if there was a finding of no fault on the part of these defendants. The high-end of the agreement was $1,750,000.00, meaning that if the jury returned a damage award greater than this figure, relative to these defendants' liability, the plaintiffs agreed to accept a settlement amount of $1,750,000.00. Plaintiffs were ultimately paid $1,636,949.91, pursuant to their agreement with these defendants.
[7] We note that none of the physical therapy defendants who settled with Ms. Batson had entered into a contract for services with the State or SLMC. Moreover, the deposition of Dianna Schenk, introduced at an earlier proceeding wherein the admissibility of the certificates were discussed, convinces us that no true determination of these defendants' qualification under the MLSSA was made prior to issuance of the certificates. Ms. Schenk is the administrative services assistant with the State of Louisiana, Division of Administration, who issued the certificates herein. When questioned at her deposition regarding the procedure she utilized in determining whether these defendants in fact qualified under the MLSSA as state qualified health care providers, she stated that she merely telephoned some unidentified individual at SLMC, and requested that the individual orally advise her whether the physical therapy defendants were state health care providers at the time these incidents occurred. Unfortunately, the record does not contain a transcript of the hearing at which this deposition was introduced, to indicate what other information, if any was gleaned with regard to the issuance of the certificates.

Interestingly, the physical therapy defendants entered into the "high-low" settlement with plaintiffs during the course of trial, after the alleged trial court "ruling" that SLMC contends established that these defendants were entitled to protection under the MLSSA. Obviously, these defendants did not believe that their status as qualified state health care providers was a settled issue, considering their agreement to pay the amounts set forth in the agreement, i.e., a low amount of $750,000.00 even if the jury returned a verdict finding them not at fault, and a high amount of $1,750,000.00.
[8] If, in fact, it is determined that the physical therapy defendants were state qualified health providers, then the State would be relieved of its liability to Ms. Batson for the flexion contractures claim alone, in that she would have already received the statutory cap for this claim from a qualified state health care provider. Cf. Turner v. Massiah, 94-2548 (La. 6/16/95), 656 So.2d 636, 640-641 (La.1995)(interpreting LSA-R.S. 40:1299.42, the Medical Malpractice Act which governs private health care providers). However, as pointed out by plaintiffs herein, if these physical therapy defendants are found not to be qualified state health care providers, the State then would not automatically be relieved of any further liability to Ms. Batson. Rather, Ms. Batson's recovery would be reduced only by the proportionate share of fault of the settling tortfeasors, i.e., SLMC and the State would be liable for 60% of Ms. Batson's total damages for the flexion contractures. LSA-C.C. art. 1803; Taylor v. United States Fidelity & Guaranty Insurance Company, 630 So.2d 237, 239 (La.1993).

As noted above, in awarding damages for this claim, the trial court specifically held that, even after reducing the award by the percentage of fault attributable to the settling physical therapy defendants, the portion of Ms. Batson's general damages for which SLMC and the State would be liable exceeded the $500,000.00 cap. Thus, the trial court already took into consideration a reduction of SLMC's and the State's liability to Ms. Batson by the proportionate share of fault of the physical therapy defendants, and no further reduction would be warranted.