869 So.2d 141 (2004)
Julie HERNANDEZ and Berdelio Hernandez, Individually and on Behalf of Their Minor Child, Chris Lee Hernandez
v.
CHALMETTE MEDICAL CENTER a/k/a UHS De La Ronde, Inc.
No. 2001-CA-0074, 2003-C-1169, 2003-CA-1456.
Court of Appeal of Louisiana, Fourth Circuit.
February 4, 2004.
*143 R. Ray Orrill, Jr., Leslie A. Cordell, W. Christopher Beary, Lyn M. Curlin, Orrill, Cordell & Beary, L.L.C., New Orleans, Counsel for Plaintiffs/Appellees.
C. William Bradley, Jr., Nicole Duarte Martin, Lemle & Kelleher, L.L.P., New Orleans, Counsel for Gregory A. Redmann, M.D.
J. Michael Daly, Jr., Law Offices of Robert E. Birtel, Metairie, Counsel for Charles Lavis, M.D.
George E. "Skip" Cain, Ann Marie LeBlanc, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, Counsel for Patients' Compensation Fund.
Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge DENNIS R. BAGNERIS, Sr.
MURRAY, Judge.
Defendants, Dr. Gregory Redmann and Dr. Charles Lavis, and intervenor, the Louisiana Patient's Compensation Fund ["PCF"], appeal the trial court's judgment awarding damages to plaintiffs in this medical malpractice action. Defendants also appeal the trial court's denial of the exception of prescription, which was initially raised in this court by Drs. Redmann and Lavis and was heard in the district court following our remand for that purpose.[1]

FACTS
On December 30, 1993, nine-year-old Chris Hernandez was brought to the Chalmette Medical Center emergency room complaining of pain in his left leg resulting from a football injury. He was examined by Dr. Redmann, who ordered x-rays. After the x-ray films were viewed by Dr. Lavis, a radiologist, Chris was diagnosed with a hip and leg contusion and was sent home approximately three hours after he had arrived at the hospital. The next morning, Dr. Lavis reviewed Chris's x-rays in order to prepare his formal interpretation, and noticed for the first time an abnormality in the hip film. Dr. Lavis informed Dr. Alfred Friedrichsen, the emergency room physician on duty that day, who immediately called the Hernandez family and requested that they bring Chris back to the hospital. When Chris arrived that morning, he underwent repeat x-rays and a CT scan of his left hip and pelvis. Following these tests, Chris was diagnosed with a dislocated hip. After consulting by telephone with Dr. Bennett, a pediatric orthopedic surgeon, Dr. Friedrichsen attempted to reduce the hip. *144 Dr. Friedrichsen was assisted during this procedure by Ms. Anne Scardino, a registered nurse. Dr. Friedrichsen's first attempt at reduction was unsuccessful. However, after Chris was given more sedative medicine, Dr. Friedrichsen made a second attempt, which succeeded. Chris was discharged with instructions to stay on complete bed rest with abduction pillows between his legs.
Four days later, Chris was seen by Dr. Bennett at Children's Hospital, who found that the reduction was only a pseudo-reduction because something, presumably a bone fragment, was interposed between the socket and the hip. In an attempt to correct the situation, Chris underwent two surgical procedures: an arthrogram on January 4, which was not successful; and a femoral arthrotomy on January 10, 1994, in which the hip was opened up and the piece of labrum that had been preventing a complete reduction was flipped back to its proper position. In March, 1994, Dr. Bennett diagnosed Chris with avascular necrosis, a condition that results from disruption and corresponding lack of blood supply to the femoral head. Chris was placed in a complete body cast for three months and then on weight-bearing crutches. According to Dr. Bennett, the damage to Chris's hip will almost certainly require future surgery (arthrodesis and/or an artificial hip).

PROCEEDINGS BELOW
Mr. and Mrs. Hernandez filed a proposed complaint of medical malpractice with the PCF against Chalmette Medical Center [CMC] and Dr. Friedrichsen on December 28, 1994, within one year of Chris's initial examination in the emergency room. The instant civil action was instituted against CMC on December 28, 1995. On September 11, 1996, plaintiffs filed with the PCF a proposed complaint of medical malpractice against Dr. Redmann. On December 17, 1996, a medical review panel exonerated CMC and Dr. Friedrichsen. On September 15, 1997, within the statutorily-provided time frame, plaintiffs filed their first supplemental and amending petition, adding Dr. Friedrichsen as a defendant. On September 30, 1997, plaintiffs filed their proposed claim of malpractice against Dr. Lavis. In July, 1998, a second medical review panel concluded that Dr. Redmann and Dr. Lavis had breached the applicable standard of care. On September 16, 1998, plaintiffs filed their second supplemental and amending petition, adding Dr. Redmann and Dr. Lavis as defendants. On May 6, 1999, plaintiffs dismissed CMC from the lawsuit following settlement in the amount of $5,000, and reserved their rights against the remaining defendants.
A bench trial was held February 2-3, 2000. On April 24, 2000, the trial court rendered judgment in favor of plaintiffs against Dr. Redmann in the sum of $100,000, against Dr. Lavis in the sum of $100,000, and against those same defendants in solido for costs; the court also rendered judgment in favor of Dr. Friedrichsen, dismissing plaintiffs' claims against him. In written reasons for judgment, the court noted that both Dr. Redmann and Dr. Lavis were negligent in their treatment of Chris Hernandez, finding them to be 100% at fault in causing his injuries. The court also noted that because the Hernandez's damages exceeded the statutory cap, the award was the maximum amount allowable by law. Finally, the court concluded that plaintiffs had failed to meet their burden of proving that Dr. Friedrichsen had breached the standard of care.
In an amended judgment issued May 26, 2000 in response to plaintiffs' motion for new trial, the trial court increased the damages awarded against Dr. Redmann and Dr. Lavis to $500,000 each, with the *145 stipulation that each of them would not be personally liable for any amount in excess of $100,000; the court also awarded to plaintiffs against the PCF medical expenses in the amount of $14,234.79, as well as future medical care and related benefits for the remainder of Chris Hernandez's life.
Following the judgment, the PCF intervened for purposes of appeal. Dr. Redmann, Dr. Lavis and the PCF timely filed a suspensive appeal. Plaintiffs neither answered the appeal nor filed an appeal in their own right. On October 31, 2001, prior to the case being submitted for decision, the three appellants jointly filed an exception of prescription in this court, which the plaintiffs opposed. The basis of the exception was that the only timely sued defendants were Dr. Friedrichsen, who was exonerated at trial, and CMC, which had settled with the plaintiffs prior to trial. The appellants argued that, in the absence of a finding of liability on the part of either of those, neither would be considered a joint tortfeasor with Drs. Redmann and Lavis; therefore, the action was prescribed as to them.
On August 21, 2002, this court remanded the matter for a full evidentiary hearing and ruling by the trial court on the exception of prescription. We stayed proceedings in this court and deferred consideration of the merits of this appeal pending the ruling of the trial court. Hernandez v. Chalmette Medical Center, XXXX-XXXX (La. App. 4 Cir. 8/21/02), 826 So.2d 641.
The trial court heard the exception on February 21, 2003. Following the hearing, the trial court found that CMC was liable based on the theory of respondeat superior for the fault of Ms. Scardino in breaching the standard of care of a registered nurse. The trial court also concluded that this fault rendered CMC solidarily liable with Drs. Redmann and Lavis. Accordingly, the trial court rendered judgment denying the exception of prescription on May 28, 2003. Dr. Redmann, Dr. Lavis, and the PCF filed both a writ application and an appeal from the judgment; this court has consolidated both with the original appeal.

PRESCRIPTION

Evidence
Two witnesses testified at the trial of the exceptionNurse Anne Scardino, the CMC employee who assisted Dr. Friedrichsen in the reduction of Chris Hernandez's dislocated hip, and Dr. Paul Blaylock, who was qualified as an expert in the fields of emergency medicine and nursing standards in the emergency room.
Ms. Scardino testified that when Dr. Friedrichsen made the first attempt to reduce the hip, she had only given Chris 2.5 milligrams of Valium and 25 milligrams of Demerol, although Dr. Friedrichsen's orders called for 10 milligrams of Valium and 50 milligrams of Demerol. She stated that she was following a commonly used procedure known as titration, or giving medication in increments. Nurse Scardino did not recall having told Dr. Friedrichsen the level of medication she had administered before he began the procedure. However, the doctor's notes and prior trial testimony indicated that after the first attempt failed, the nurse informed him that she had not yet administered all the medication to the patient. Nurse Scardino testified that prior to the procedure on Chris Hernandez, she had never been involved in a closed reduction of a dislocated hip. According to her own notes, the patient tolerated "the procedure" well, and she confirmed that she would have noted it if Chris had shown any signs indicative of pain. She admitted, however, that inadequate medication could have been the problem in the first attempt at reduction.
*146 Dr. Paul Blaylock testified that he had reviewed Ms. Scardino's deposition, heard her testify, and had also reviewed the medical records in the case. He stated that during a closed reduction of a dislocated hip, the patient is generally in severe pain; once the reduction is completed, the pain is reduced. According to his testimony, when performing a closed reduction of a dislocated joint, it is imperative that the patient be given the maximum pain medication and maximum muscle relaxation prior to the procedure, because a major element of a successful reduction is sedation and relaxation. Dr. Blaylock noted that the difficulty encountered in performing this type of procedure is overcoming the muscle ligaments that are in spasm. He stated that it is not appropriate to titrate the medication for a thirty-second to one-minute procedure such as this reduction, and that Nurse Scardino breached the applicable standard of care by doing so. He emphasized the importance of using adequate sedation, saying that it is necessary because "you want to manipulate the hip as few times and [for] as brief a period as possible." According to Dr. Blaylock, the more manipulation there is, the greater the pain and the greater the risk of complications such as a fracture, chip or tear in the acetabular joint and/or the development of avascular necrosis, which is what Chris Hernandez had.
Dr. Blaylock surmised from Dr. Friedrichsen's notes and prior testimony that Dr. Friedrichsen was unaware until after he concluded his first attempt at reduction that Chris had not been given the full dose of sedatives he had ordered. Based on this assumption, Dr. Blaylock opined that Nurse Scardino's failure to tell Dr. Friedrichsen before he began the procedure that the patient had not yet been given the full dosage of medication was a breach of the standard of nursing care.
In Dr. Blaylock's opinion, the amount of medication ordered for Chris was well within the guidelines for this type of procedure, stating that the maximum allowable dosage for a child of Chris' age and weight would have been 20 milligrams of Valium and 75 milligrams of Demerol. Dr. Blaylock opined that the amount of sedation actually administered, which was one-fourth the amount of Valium ordered and one-half the amount of Demerol, was clearly inadequate and was a substantial factor in the lack of success of the first attempt at reduction. Dr. Blaylock confirmed that, based on the medical records, there was approximately a 35-40 minute delay between the first, unsuccessful attempt at reduction and the second attempt, which was successful. He stated that the unsuccessful attempt had, in his opinion, caused Chris increased and unnecessary pain. Finally, Dr. Blaylock was asked whether the delay between the two attempts had contributed to Chris' eventual development of necrosis. Plaintiffs' counsel objected to the question as being outside Dr. Blaylock's field of expertise, and the objection was sustained. Dr. Blaylock's answer to the question was then proffered. He stated that the 35-40 minute delay and the need for further manipulation of the joint had, in his opinion, increased the risk of Chris later developing a complication such as necrosis.

Discussion of Law
Defendants first argue that it was improper for this court to allow plaintiffs to re-litigate the liability of CMC in a post-trial prescription proceeding. We addressed this issue in our initial opinion when we determined that a remand for trial of the exception of prescription was an appropriate procedure under the particular circumstances of this case and was not without precedent. See Vicknair v. Hibernia Bldg. Corp., 479 So.2d 904 (La.1985). *147 As defendants have cited no jurisprudence distinguishing Vicknair from the instant case, we decline to revisit this issue.
Defendants next argue that plaintiffs failed to meet their burden of proving that CMC was solidarily liable with Drs. Redmann and Lavis, and thus plaintiff's timely-filed suit against CMC did not interrupt prescription against the doctors. It is not disputed that if CMC is solidarily liable with the doctors, the timely filed suit interrupted prescription as to the doctors.[2]
As we noted in our initial opinion, where, as in the instant case, the action appears prescribed on its face, the burden is on the plaintiff to prove the suspension or interruption of the prescriptive period, and if the plaintiff's basis for claiming interruption is solidary liability between two or more parties, then the plaintiff bears the burden of proving that solidary relationship. Hernandez, supra, p. 7, 826 So.2d at 645 (citing Younger v. Marshall Industries, Inc., 618 So.2d 866, 869 (La. 1993)).
With solidary obligations, it is the co-extensiveness of the obligations for the "same" debt that determines the solidarity of the obligation. Weber v. Charity Hospital of Louisiana, 475 So.2d 1047, 1051 (La.1985) (citing Narcise v. Illinois Central Gulf Railroad, 427 So.2d 1192 (La. 1983)). Therefore, in the instant case, we must determine first, whether CMC was at fault, and second, whether any damages suffered by plaintiffs are attributable to the fault of both CMC and Drs. Redmann and Lavis, which would make these parties solidarily liable.
In arguing that no such solidarity exists, defendants first rely upon the trial court's original reasons for judgment as to Dr. Friedrichsen, wherein the court stated:
Plaintiff's [sic] failed to meet their burden of proof in their claim against Dr. Friedrichsen. This is in regard to both the standard of care and causation issues. At the point when Dr. Friedrichsen first saw Chris Hernandez, the damage had been done. Dr. Friedrichsen simply attempted to deal with a bad situation and tried to rectify a condition brought about by the failures and omissions of other doctors. The evidence does not sustain a finding that Dr. Friedrichsen was negligent or the bad situation worse [sic]. There is no showing that this physician breached the standard of care applicable to him.
Consequently, defendants argue that the trial court's exoneration of Dr. Friedrichsen on the basis that "the damage had been done" by the time he came on the scene precludes any finding of solidary liability on the part of CMC, because the negligence of Nurse Scardino also occurred after "the damage had been done." This argument is not persuasive; Dr. Friedrichsen was not exonerated simply because he came on the scene after the initial problem had occurred, he was exonerated because the trial court found he had not done anything to exacerbate the problem. The trial court emphasized that the evidence did not show Dr. Friedrichsen was negligent or that he had done anything *148 to make a bad situation worse. In our view, Dr. Friedrichsen's actions are not comparable to those of Nurse Scardino, whose negligence, at least according to the testimony of Dr. Blaylock, did indeed worsen an already bad situation. Dr. Blaylock's opinion that Nurse Scardino's failure to give Chris the full dose of medication before the procedure began constituted negligence is uncontroverted by any other expert testimony and was obviously accepted by the trial court. We find no manifest error in this conclusion of the trial court.
Defendants next argue that there was no evidence introduced at the hearing on prescription to show that Chris's hip condition, in terms of avascular necrosis and/or any other long-term complication, was exacerbated by Ms. Scardino's failure to properly administer the sedatives and the consequent failure of the first hip reduction by Dr. Friedrichsen. We disagree. Dr. Blaylock's testimony (exclusive of his proffered testimony) clearly indicates that the longer a reduction is delayed and the more manipulation that is done, the more likely it is that the patient will suffer a complication such as avascular necrosis. Dr. Blaylock stated that the best result could be expected in 4-6 hours, but that 12 hours is better than 24 hours, and 24 hours is better than 48 hours, etc. From this testimony, the trial court could have reasonably inferred that the additional 35-40 minute delay and further manipulation of the hip joint probably contributed to Chris' eventual development of avascular necrosis. We particularly note that such an inference would be reasonable even absent Dr. Blaylock's proffered opinion that the additional delay did contribute to the necrosis.[3] Moreover, although Ms. Scardino said she had no notes of Chris exhibiting symptoms of pain, and that she would have noted it had she observed it, Dr. Blaylock's testimony clearly supports a finding that Chris suffered additional pain as a result of the failed attempt at reduction. We therefore find no manifest error in the trial court's conclusion that Chris suffered damages as a result of the negligence of Ms. Scardino, a CMC employee for whose fault the hospital is responsible.
The next question before this court is whether the damages Chris suffered as a result of having to undergo two attempts at reduction, plus an additional 35-40 minute delay, can be separated from the damages he suffered as a result of the original 21-hour delay, which the trial court held was caused by the negligence of Drs. Redmann and Lavis. If the damages cannot be separated, then solidary liability exists. Stated another way, where defendants are liable for the same injury, they are solidarily bound. Younger v. Marshall Industries, Inc., 618 So.2d 866, 868 n. 4 (La. 1993).
The seminal case addressing the solidarity of obligations in situations like the instant one is Weber v. Charity Hospital of Louisiana, supra. In that case, one issue was whether the tortfeasor driver was liable for his victim having contracted hepatitis from tainted blood while she was being treated for injuries she had received in the automobile accident caused by the tortfeasor. The court stated:
As to the host driver's liability for the damages which resulted from the blood transfusion, a tortfeasor may be liable not only for the injuries he directly causes to the tort victim, but also for the tort victim's additional suffering caused *149 by inappropriate treatment by the doctor, nurse or hospital staff member who treats the injuries directly caused by the tortfeasor. Berger v. Fireman's Fund Insurance Co., 305 So.2d 724 (La.App. 4th Cir.1974); Hillebrandt v. Holsum Bakeries, Inc., 267 So.2d 608 (La.App. 4th Cir.1972); Hudgens v. Mayeaux, 143 So.2d 606 (La.App. 3rd Cir.1962); Restatement (Second) of Torts § 457 (1965). The original tortfeasor's responsibility may extend to the risk involved in the human fallibility of physicians, surgeons, nurses and hospital staffs which is inherent in the necessity of seeking medical treatment.
Here, Gaynell Weber sustained a collapsed lung (among other injuries) in the automobile accident. When she underwent surgery to reinflate her lungs, she received several blood transfusions. She contracted hepatitis from contaminated blood used in the transfusions.
The question is essentially one of legal causation which should be viewed under a duty-risk analysis. The host driver's negligence was a cause in fact of Gaynell's contracting of hepatitis, since the blood transfusion would not have been necessary but for the original injury caused by the negligence. Once causation in fact is established, the next step in determining liability is to determine what duty was imposed under the circumstances and whether this particular risk was within the scope of the protection extended by the imposition of that duty. Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1970). The duty on the host driver to refrain from causing injury to another by the negligent operation of her vehicle encompassed the risk that the tort victim's injuries might be worsened by the treatment for those injuries. Moreover, there is an ease of association between the injury and the rule of law which gave rise to the duty. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). We therefore conclude that the host driver was liable for any damages resulting from the blood transfusion, along with any other parties whose fault caused Gaynell Weber to contract hepatitis. (emphasis supplied;footnotes omitted).
475 So.2d at 1050.[4]
In Younger v. Marshall Industries, Inc., supra, the plaintiff was injured working offshore on a vessel, and was taken to a hospital. Two days later, while in the hospital, he was further injured when a shower chair in which he was sitting collapsed. The plaintiff and his wife timely sued the vessel on which he was working at the time of his original injury, as well as the manufacturer of the chair. Over one year after the accident, the plaintiffs filed a supplemental and amending petition seeking to add the hospital as a defendant. The trial court granted the hospital's exception of prescription. The court of appeal affirmed. On appeal to the Louisiana Supreme Court, the issue was whether, under Weber, the vessel and the hospital were solidary obligors such that the timely-filed suit against the vessel interrupted the running of prescription as to the hospital. The court held that the plaintiffs had to prove that the injury to the husband occurred during, was directly related to, or resulted from treatment for the original injury, because under Weber his injury *150 during the hospital stay that was unrelated to treatment for the original injury was not a risk encompassed within the original tortfeasor's duty. The court found no evidence that the plaintiff-husband had been instructed to use the shower chair or had been placed there by hospital personnel, and thus found no error in the trial court's determination that the plaintiffs failed to meet their burden of proving an interruption of prescription based on Weber.
In Littleton v. Montelepre Extended Care Hospital, 94-1661 (La.App. 4 Cir. 6/7/95), 657 So.2d 572, the tort victim entered Montelepre Extended Care Hospital on August 14, 1990, where she developed a decubitus ulcer due to inadequate nursing care. She was discharged from Montelepre on August 22, and was admitted to a hospital, where she remained until September 17, when she was admitted to Pontchartrain Guest House, operated by Goux Enterprises. Due to the negligence of Goux's employees at Pontchartrain Guest House, where the victim remained until October 8, the condition of the ulcer she first developed at Montelepre was aggravated. This court declined to find under these circumstances that Montelepre and Goux were solidarily liable for purposes of venue, rejecting the plaintiffs' argument that solidary liability existed as contemplated under Weber and Younger. This court distinguished Weber and Younger, stating:
In those cases [Weber and Younger ] the subsequent injuries were incurred during the course of each plaintiff's treatment for the injuries caused by the original tortfeasor. In the present case each defendant's contact with plaintiff arose out of that defendant's undertaking to provide general nursing home care... Montelepre was allegedly negligent in its care of plaintiff with the result that the plaintiff contracted this ulcer. Plaintiff left Montelepre and almost a month later entered Goux's nursing home. Goux did not did not undertake to provide plaintiff with specific treatment of any injuries caused by Montelepre; it was to provide general nursing care. Nor was the aggravation of plaintiff's ulcer the result of by her weakened condition caused by Montelepre. It cannot be said that that the duty of Montelepre to provide proper care to the plaintiff while she was in Montelepre's nursing home included the risk that she might be injured as a result of the negligence of a second nursing home in whose care she would subsequently place herself. There is no ease of association between the injuries caused by Goux's negligence and the duty on Montelepre to provide proper nursing care to plaintiff.
Id., p.4, 657 So.2d at 574.
In the instant case, the issue is whether the duty to provide proper medical care, which was breached by Drs. Redmann and Lavis, encompassed the risk that the patient, upon returning to the hospital to receive the previously neglected care, would again be subject to an act of malpractice or breach of care that would further worsen his condition. According to the reasoning of Weber, the risk of suffering malpractice while undergoing a normal hospital procedure or operation is included in the risk borne by the tortfeasor whose fault sent the victim to the hospital. In the instant case, the mistakes of Drs. Redmann and Lavis necessitated Chris Hernandez's return to the hospital and included the risk that he would be further injured by his treatment there. We also find that there is an ease of association between the injury (the development of necrosis) and the rule of law which gave rise to the duty (the obligation of doctors and nurses to provide appropriate care). If, as in Weber, malpractice is considered *151 part of the risk of being treated in a hospital, then a physician's malpractice that necessitates a patient having to return to that same hospital for further treatment must include the risk that further malpractice will occur that will exacerbate the patient's condition. We therefore find the instant case to be indistinguishable from Weber. We do, however, distinguish this case from Younger, in which the Supreme Court found that the collapse of the shower chair was unrelated to treatment of the original injury; in the case of Chris Hernandez, the negligent treatment of the dislocated hip on Chris' Hernandez's second visit to the hospital was clearly related to the prior negligent treatment of the same injury that caused him to return. We also distinguish the instant case from Littleton, in which we found that a breach of care by one nursing home that caused an injury did not encompass the risk of the patient being reinjured by a second nursing home in which she had placed herself; in the instant case, unlike in Littleton, all of Chris' Hernandez's subsequent problems occurred during the course of treating the misdiagnosed dislocated hip and repairing the damage from the defendants' failure to timely diagnose it.
Accordingly, we find no error in the trial court's denial of defendants' exception of prescription. Because Drs. Redmann, and Lavis and CMC are solidary obligors, the timely filed complaint against CMC interrupted prescription as to the two physicians.

LIABILITY

Negligence
Defendants challenge the trial court's finding that both Dr. Redmann and Dr. Lavis breached the applicable standard of medical care. In order to disturb this finding on appellate review, we must conclude that no reasonable factual basis exists for the finding, and our review of the entire record must establish that the factfinder was clearly wrong or manifestly erroneous. Stobart v. State, through DOTD, 617 So.2d 880, 882-83 (La.1993).
In the instant case, the medical review panel, whose report was placed into evidence at trial, unanimously found that both Dr. Redmann and Dr. Lavis had breached the applicable standard of care. Dr. Redmann, an emergency room physician, contends he should not have been found liable because he was entitled to rely upon the opinion of Dr. Lavis, a board-certified radiologist, who initially looked at Chris Hernandez's x-ray films and failed to see the dislocated hip joint. In support of this argument, he relies on the testimony of defendants' expert in emergency medicine, Dr. Joseph Litner, who stated that the standard of care in emergency medicine holds that an ER doctor is entitled to rely on a radiologist's interpretation of x-rays in making a diagnosis.
Nevertheless, we find there is ample evidence in the record which supports the trial court's conclusion that Dr. Redmann breached the applicable standard of care in his treatment of Chris Hernandez. Dr. Paul Blaylock, the plaintiffs' expert in emergency medicine, testified that Dr. Redmann missed all the classic signs of posterior hip dislocation when he examined Chris. Dr. Redmann himself testified that the position of Chris' leg would have been an important factor to consider when diagnosing a dislocated hip; yet, in his notes regarding the clinical exam, Dr. Redmann never mentions the position of Chris' leg. However, Chris Hernandez, his mother, his father, and Dr. Friedrichsen (who saw Chris the next day) all testified that Chris' left leg was flexed, adducted and internally rotated, and that Chris was unable to move it from that position. Dr. Friedrichsen also noted Chris' leg was shortened. Uncontroverted expert testimony established *152 that a flexed knee with the leg adducted and shortened is the classic presentation for a dislocated hip.
With regard to Chris' x-rays, Dr. Redmann testified that he was capable of interpreting them himself and in fact, had intended to do so when he ordered them, as he had not called for a radiological consult. According to Dr. Redmann's testimony, Dr. Lavis happened to walk by the emergency room, at which point he and Dr. Redmann viewed the x-rays together. Given this testimony, it was reasonable for the trial court to hold Dr. Redmann independently responsible for his own failure to properly interpret Chris' x-rays as showing a dislocation, despite Dr. Lavis' opinion. In view of the evidence, we find no manifest error in the trial court's finding of fault on the part of Dr. Redmann.
Dr. Lavis essentially makes two arguments as to why the trial court's finding of fault as to him is manifestly erroneous. First, he argues that, in the absence of a radiologist's opinion, there was no expert testimony to establish that he breached the standard of care. This argument is unpersuasive. Dr. Mario Calonje, a board-certified radiologist who was a member of the medical review panel, confirmed at trial that the panel unanimously believed Dr. Lavis' failure to interpret the x-ray films correctly on December 30, 1993 was a deviation from the standard of care. Dr. Lavis next argues that Dr. Calonje's opinion does not apply because, as Dr. Calonje admitted, the medical review panel assumed that Dr. Lavis had seen the complete set of Chris' x-ray films; however, Dr. Lavis claimed at trial that he never saw the hip films on December 30th, but only those of Chris' knee and femur. Dr. Lavis testified that he did not see the hip films until the next day.
We cannot accept Dr. Lavis' argument, however, in view of the substantial evidence in the record impeaching his credibility on this point. For instance, the "Position Paper" submitted by Dr. Lavis to the medical review panel contains no mention of his claim that he did not see all the x-rays on December 30th; he merely states that upon reviewing the films the next day, he came to a different conclusion. Moreover, Dr. Redmann testified that he and Dr. Lavis together reviewed all the films, including the hip films, on December 30th. In addition, Dr. Friedrichsen stated in his deposition that he had a conversation with Dr. Lavis on the morning of December 31st, at which time Dr. Lavis indicated that he had changed his mind about his interpretation of the films he had viewed the night before, as a result of which he believed Dr. Friedrichsen needed to get Chris Hernandez back to the emergency room. In light of this evidence, the trial court's decision not to credit Dr. Lavis' trial testimony is not manifest error. Finally, there is evidence that Dr. Lavis' negligence went beyond his misinterpretation of the initial set of x-rays. Dr. Friedrichsen also testified that after he had apparently successfully reduced Chris' hip dislocation on December 31st, Dr. Lavis failed to inform him that the CT scan showed interposing bone fragments that were actually blocking a complete reduction. Dr. Friedrichsen testified that if he had had this information, he would have referred Chris to a pediatric orthopedist rather than sending him home prematurely. Accordingly, in light of the entire record, we cannot say that the trial court was clearly wrong in determining that Dr. Lavis breached the applicable standard of care.

Causation
With regard to causation, the defendants argue that Chris' development of avascular necrosis was more likely caused by his initial football injury than by any subsequent *153 breaches of care on the part of the physicians who cared for Chris. In addition, the PCF contends that the trial court erred by permitting Dr. Blaylock to testify as to causation because he lacked the medical expertise, and that without Dr. Blaylock's testimony, there is no medical evidence to establish causation.
In a medical malpractice action, causation is a determination of fact which should not be reversed on appeal absent manifest error. Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991). This court has held that to establish causation, the defendant's conduct "must increase the risk of a patient's harm to the extent of being a substantial factor in causing the result but need not be the only cause." Levron v. State, 94-2094, p.11 (La.App. 4 Cir. 4/24/96), 673 So.2d 279, 288 (quoting Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 720 (La. 1986)). Therefore, the question for the trier of fact is: was the increased risk caused by the defendant's negligence a substantial factor in producing the harm? Id. at p. 11, 673 So.2d at 288. Applying this standard to the instant case, the trial court had to determine whether the delay in the proper diagnosis and treatment of Chris Hernandez's injury increased the risk that he would develop avascular necrosis, and if so, whether this increased risk was a substantial factor in producing that result.
Expert testimony on this issue included that of Dr. Blaylock, an emergency room physician, and Dr. James T. Bennett, the orthopedic surgeon who performed two surgical procedures on Chris Hernandez to correct the problem after it was discovered that Dr. Friedrichsen's closed reduction was not concentric. Dr. Blaylock testified that in his twenty-six years as an emergency room physician, he had performed approximately one hundred twenty-five to one hundred fifty hip dislocations, with thirty to forty of those being children. In addition, Dr. Blaylock had taught medical students and residents how to perform these reductions. In Dr. Blaylock's experience, the incidence of avascular necrosis in children was less than five percent when the hip dislocations were timely diagnosed and the reductions performed promptly. This estimate coincides with the statistics derived from medical studies reported in Rosen's Textbook of Emergency Medicine, referred to by Dr. Blaylock, which notes a six percent incidence of avascular necrosis in pediatric patients with hip dislocations.
Dr. Blaylock and every other physician who testified at trial, including Drs. Redmann, Lavis and Freidrichsen, all agreed that hip dislocations are surgical emergencies that require immediate diagnosis and reduction, and that the sooner the reduction is performed, the better the prognosis; a delay in treatment generally increases the chances of complications occurring. Dr. Blaylock and Dr. Bennett both testified that the best results and the fewest complications occur when the reduction is performed within four to six hours of the injury. Dr. Blaylock testified that some medical literature indicates that a good result may still be achieved if the reduction is performed within twelve hours. Dr. Bennett explained that the longer the delay, the greater the chance of developing avascular necrosis; this is because the longer the blood supply to an organ is compromised, the more likely it is that the organ will suffer permanent damage or death.
Dr. Bennett, who testified that he had never reduced a pediatric hip dislocation, cited statistics showing that when the dislocation is reduced within four to six hours, approximately thirty percent of adults and less than thirty percent of children develop avascular necrosis. Nevertheless, in Chris *154 Hernandez's case, Dr. Bennett opined that the avascular necrosis was most probably caused by the original trauma, i.e., the football injury; this opinion was based upon his determination that the labral tear that prevented Dr. Friedrichsen from achieving a perfectly concentric reduction probably occurred at the time of the Chris' original injury, rather than during any subsequent manipulation of the femur or hip. However, even Dr. Bennett testified that he could not say that the twenty-one hour delay in reducing the hip had no real causative effect on the development of the avascular necrosis; he said simply "no one knows."
Considering defendants' arguments in light of the totality of the evidence, we do not find manifest error in the trial court's conclusion on causation. First, we cannot say the trial court erred by allowing Dr. Blaylock to give expert testimony regarding the probability of developing avascular necrosis after a reduction of a dislocated hip, considering Dr. Blaylock's experience with the procedure. The question of whether a witness is an expert, the scope of his expertise, and the breadth of his opinion are within the discretion of the trial court. Bosse v. Westinghouse Electric, Inc., 93-1898, p.6 (La. App. 4 Cir. 5/17/94), 637 So.2d 1157, 1160. Dr. Blaylock, although not an orthopedist, testified he had performed many pediatric hip reductions and had done follow-up care on those patients. Dr. Blaylock's testimony was that in his experience, only five percent of children whose hip dislocations are timely reduced develop avascular necrosis. The trial court was capable of weighing this testimony in light of its source. The effect and weight to be given expert testimony is within the broad discretion of the trial judge. Lanasa v. Harrison, XXXX-XXXX, XXXX-XXXX, p.5 (La.App. 4 Cir. 8/7/02), 828 So.2d 602, 605, writ denied, 2002-2512 (La.11/27/01), 831 So.2d 286. In the instant case, the trial court did not abuse its discretion by allowing Dr. Blaylock to testify regarding his experience with hip dislocations.
Dr. Bennett, an orthopedic surgeon, indicated he had never reduced a trauma-induced (as opposed to a genetic) dislocated hip on a child; he said such cases are rare and because they are fairly urgent situations, usually the reduction is done by a resident, who normally is the first physician to examine the child in the emergency room. Although Dr. Bennett testified that Chris Hernandez's necrosis was probably caused by the football injury, he admitted that when there is a delay of more than six hours in the reduction of a child's dislocated hip, the chance of that child developing a complication such as necrosis is more than seventy percent. Considering that Dr. Blaylock gave a figure of ninety-five percent, we find there exists a reasonable basis for the trial court's conclusion that the twenty-one hour delay attributable to defendants' fault was a legal cause of Chris Hernandez's development of necrosis. We therefore reject defendants' arguments regarding causation.

DAMAGES
The trial court awarded plaintiffs $14, 234.79 in past medical expenses and future medical care for the remainder of Chris Hernandez's life[5], as well as one million dollars in general damages, which equated to the statutory cap of $500,000 against each of the two physicians who were found to be liable.[6] On appeal, defendants *155 contend that the trial court's application of two statutory caps to the instant case constitutes legal error. In addition, defendants argue the trial court abused its discretion by determining that Chris Hernandez's general damages exceeded the applicable cap.

Application of Statutory Cap Under MMA
The Medical Malpractice Act (MMA) provides:
B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.
(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient.
(3)(a) Any amount due from a judgment or settlement or from a final award in an arbitration proceeding which is in excess of the total liability of all liable health care providers, as provided in Paragraph (2) of this Subsection, shall be paid from the patient's compensation fund pursuant to the provisions of R.S. 40:1299.44(C).
(b) The total amounts paid in accordance with Paragraphs (2) and (3) of this Subsection shall not exceed the limitation as provided in Paragraph (1) of this Subsection.
LA. REV. STAT. ANN. § 40:1299.42 (West 2001).
The PCF argues that the trial court's judgment awarding plaintiffs $500,000 against Dr. Redmann and $500,000 against Dr. Lavis violates the above-quoted provision of the Act. After reviewing the law and jurisprudence, we agree that the trial judge erred by awarding two caps in this case.
In Turner v. Massiah, 94-2548 (La.6/16/95), 656 So.2d 636, the Louisiana Supreme Court was faced with the question of whether to allow two caps in a case where two separate physicians had failed to diagnose the plaintiff's breast cancer. One of the physicians was a plastic surgeon who had performed breast augmentation surgery on the plaintiff and who misdiagnosed the cancer as merely scar tissue during two years of follow-up care (from 1984 to 1986); the other physician was the plaintiff's personal obstetrician/gynecologist, whom she had seen for regular checkups, including breast exams, in August of 1985 and January of 1987. These two physicians were not in practice together or in any way related, professionally or otherwise. Both the trial court and the court of appeal had held that two caps apply because there were two acts of negligence, but the Supreme Court reversed. Holding that only one cap could be applied, the Court reasoned:
The damage here, Stage 2 breast cancer, cannot be apportioned between the two tortfeasors because the damage is not severable; it is indivisible. If the damage, or injury, could have been divided into two parts, one part caused by one defendant and the other part caused by the other there would have been, in effect, two injuries. In that case, there having been two torts and two injuries, the question of two caps might have been present. In this case there were two torts but only one injury.
Id., p.7, 656 So.2d at 640.
The First Circuit followed Turner v. Massiah in another misdiagnosis case, Maraist v. Alton Ochsner Medical Foundation, XXXX-XXXX (La.App. 1 Cir. 4/4/01), *156 808 So.2d 566, writ denied, XXXX-XXXX (La.11/2/01), 800 So.2d 882. In that case, two different physicians, both working at the Ochsner Clinic, had failed to diagnose bacterial meningitis in the plaintiffs' infant daughter, Brittany, for approximately four days. The plaintiffs also alleged that Brittany received substandard care at the Medical Center of Baton Rouge, where she was sent by an Ochsner doctor for treatment once he suspected she had meningitis. The meningitis left Brittany profoundly neurologically impaired, blind and deaf. As in Turner, all the allegedly negligent health care providers were qualified under the MMA. Citing the Turner Court's conclusion that where there is one patient and one injury, only one cap applies, the First Circuit stated:
From this expression by the supreme court in Turner, we glean that when the damage cannot be apportioned between multiple tortfeasors because the damage is indivisible, the claim is not severable. Thus, if the damage or injury can be divided into two or more parts, with each part caused by a separate defendant, then each part constitutes, in effect, a separate injury under La. R.S. 40:1299.42 B(1)....
The deposition testimony of Drs. Gesn, Kemmerly and Kemp established that Brittany suffered but one injury, bacterial meningitis. Plaintiffs have failed to offer evidence showing that the damages sustained by Brittany could be divided into parts with each part traceable back to a specific delictual origin. While plaintiffs vigorously assert that the failure of the nurses at MMBR [Medical Center of Baton Rouge] to properly monitor Brittany's condition was merely an aggravation of...the bacterial meningitis caused by the alleged negligence of (some or all of) the Ochsner defendants, nevertheless they have failed to establish that Brittany suffered more than one injury.

Id., p.7, 808 So.2d at 570 (citations omitted).
Finding only one injury, the First Circuit held that Maraist plaintiffs' recovery from all the health care providers was limited to one $500,000 cap. As the plaintiffs had already received $100,000 in settlement from the Medical Center of Baton Rouge and $400,000 from the PCF, the Maraist court affirmed a summary judgment dismissing the plaintiffs' case against the Ochsner doctors. Id., p.8, 808 So.2d at 570.
With regard to the application of the statutory cap, we find no meaningful distinction between the factual situations of Turner and Maraist, and that of the instant case. Chris Hernandez developed necrosis due to the defendants' failure to timely diagnose and properly treat a dislocated hip. There is no evidence that he suffered more than one injury. Without citing any such evidence, plaintiffs nevertheless argue that the instant case is analogous to Batson v. South Louisiana Medical Center, et al., 99-0232 (La.11/19/99) 750 So.2d 949, in which the Supreme Court held that three separate caps applied to three separate acts of medical negligence under the Malpractice Liability for State Services Act (MLSSA). We find Batson inapposite for two reasons. First, the pertinent provision of the MLSSA contains significantly different language from that of the MMA. The MLSSA limits recovery to $500,00 for "the injury" for "an alleged act of malpractice." See La. R.S. 40:1299.39(F); Batson, supra, at p.11, 750 So.2d at 957. The use of singular nouns in the MLSSA contrasts with the use of plural nouns in the MMA, which limits to $500,000 the amount recoverable "for all malpractice claims for injuries to or death of a patient..." La. R.S. 40:1299.42 B(1) (emphasis supplied). Secondly, and more *157 importantly, the court in Batson found that the damages were divisible into three different injuries, each traceable to a separate act of negligence, stating:
In this case, Ms. Batson's injuries can be divided into three major events or injuries: sepsis, decubitus ulcers, and flexion contractures. The sepsis was caused by the physicians' failure to invoke preventative measures and to timely diagnose and treat the sepsis. The decubitus ulcers were caused by the nursing staff's failure to take preventative measures to prevent formation of the ulcers and to timely detect their early development. The flexion contractures were caused by the orthopedic staff's and/or physical therapists' failure to order and/or perform adequate treatment. Thus, there are three torts, three groups of tortfeasors, and three injuries. Id. at p.9, 750 So.2d at 949.
We therefore reject plaintiffs' contention that the instant case is controlled by Batson.
Plaintiffs next contend that this court's recent decision in Williams v. O'Neill, 99-2575, 99-2576, 99-2577 (La.App. 4 Cir. 3/13/02), 813 So.2d 548, writ denied, 2002-2029 (La.5/24/02), 816 So.2d 859, and the Supreme Court's recent decision in Dumas v. State Dept. of Culture, Recreation and Tourism, XXXX-XXXX (La.10/15/02), 828 So.2d 530, are authority for the application of two caps in the instant case. We disagree. The holding of Williams v. O'Neill is that the MLSSA limits recovery of plaintiffs to one single $500,000 cap for one act of medical malpractice, even though the some of the liable health care providers were qualified under the MLSSA and others were qualified under the MMA. In that case, a second-year anesthesia resident left a catheter guide wire inside the blood vessels of a patient while the patient was undergoing coronary bypass surgery. The resident was covered by the MLSSA, but the physicians supervising the resident were covered by the MMA. Despite the one-cap holding of Williams, the plaintiffs herein rely on dicta from that opinion to support their contention that two caps are justified in the instant case. The language from Williams, which plaintiffs cite, is as follows:
When two health care providers both fail to diagnose an illness, Louisiana courts have found that two separate acts of negligence were committed, one by each health care provider. Turner v. Massiah, 94-29, p.14 (La.App. 5 Cir. 7/1/94), 641 So.2d 610, 620. Further, it is well-settled in Louisiana law that a medical malpractice plaintiff may recover damages equal to two medical malpractice "caps" when two separate acts of medical malpractice by two different health care providers converge to cause the plaintiff's injuries, regardless of whether the liability of the health care providers is controlled by the MLSSA or the MMA. Batson v. South Louisiana Medical Center, 99-0232 (La.11/19/99), 750 So.2d 949, and the cases cited therein. Williams, supra, pp. 6-7, 813 So.2d at 555.
Even if the above-quoted passage was essential to this court's holding in Williams, which it is not, the language does not support plaintiffs' argument. Our use of the plural "injuries" rather than the singular form of the word, as well as our citing of Batson, indicate that a plaintiff must prove multiple injuries in order for multiple caps to apply.[7]
*158 The final case cited by plaintiffs in support of their argument is the Supreme Court's decision in Dumas v. State Dept. of Culture, Recreation, and Tourism, supra. Dumas involved a plaintiff who died in the hospital while being treated for injuries he had received in a bicycle accident. In Dumas the Court held that pre-comparative fault jurisprudence holding that the original tortfeasor may be liable for the victim's injuries caused by negligent medical treatment does not preclude the initial tortfeasor in a post-comparative fault case from presenting evidence as to the alleged malpractice of treating health care providers. Id., pp. 1-2, 828 So.2d at 531. Because the pre-comparative fault law applies to the instant case,[8]Dumas is clearly inapposite. Moreover, Dumas does not address the issue of the medical malpractice cap. We therefore reject plaintiffs' argument in this respect.
Accordingly, we conclude that the trial court committed legal error by failing to limit the damages awarded in the instant case to one $500,000 cap as provided for by La. R.S. 40:1299.42.

Quantum
Finally, defendants contend that the total amount of general damages awarded by the trial court, one million dollars ($1,000,000.00), was excessive in light of Chris Hernandez's injury. Because we find that the trial court erred by applying two caps, we need only determine whether it would have been an abuse of the trial court's discretion to have awarded $500,000 in damages.
In view of the evidence, we cannot say that an award of $500,000 would have been unreasonable or abusively high. Chris' pain was clearly prolonged by the defendant's failure to properly diagnose his injury, and his eventual development of necrosis means he will live for the rest of his life with an unstable hip. Chris endured two surgeries, and Dr. Bennett's uncontroverted testimony was that Chris will need at least two future operations, including an arthrogram and an artificial hip, which, depending upon the age of Chris when he first receives it, will probably deteriorate and have to be replaced. Defendants argue that the trial court neglected to consider Chris' failure to mitigate his damages, citing evidence that Chris did not cooperate with his doctor's instructions to remain on partial weight-bearing crutches for fourteen months after his surgery. However, we cannot say that the trial court abused its discretion in declining to penalize a nine-year-old boy for his failure to fully adhere these instructions, especially when Dr. Bennett testified that telling a child of Chris' age to be partial weight bearing is like telling a puppy not to put down its leg. Moreover, Dr. Bennett confirmed that Chris' prognosis was very poor from the outset, regardless of how much or how little weight was put on his leg. Dr. Bennett testified he could not say that the eventual collapse of the head of Chris' femur was completely caused by Chris' failure to use his crutches as instructed.
Therefore, after considering the entire record, we conclude that it would not have been unreasonable for the trial court to have determined that the plaintiffs' damages exceeded the $500,000 medical malpractice cap.

CONCLUSION
Accordingly, for the reasons stated herein, the May 28, 2003, judgment of the *159 district court denying the exception of prescription is affirmed.
The May 26, 2000, judgment of the trial court is reversed insofar as it awarded plaintiffs the sum of five hundred thousand dollars ($500,000.00) against Dr. Gregory A. Redmann and the sum of five hundred thousand dollars ($500,00.00) against Dr. Charles Lavis.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiffs, JULIE HERNANDEZ AND BERDELIO HERNANDEZ, individually and on behalf of their minor child, CHRIS LEE HERNANDEZ, and against DR. GREGORY A. REDMANN in the sum of TWO HUNDRED FIFTY THOUSAND AND 00/100 ($250,000.00) DOLLARS plus legal interest from the date plaintiffs filed their request for review of their claim, pursuant to La. R.S. 40:1299.47 A until paid in full; provided that Dr. Gregory A. Redmann is not personally liable for said amounts in excess of $100,000.00, plus legal interest, in accordance with La. R.S. 40:1299.42 B(2).
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of JULIE HERNANDEZ AND BERDELIO HERNANDEZ, individually and on behalf of their minor child, CHRIS LEE HERNANDEZ, and against DR. CHARLES LAVIS in the sum of TWO HUNDRED FIFTY THOUSAND AND 00/100 ($250,000.00) DOLLARS plus legal interest from the date plaintiffs filed their request for review of their claim, pursuant to La. R.S. 40:1299.47 A until paid in full; provided that Dr. Charles Lavis is not personally liable for said amounts in excess of $100,000.00, plus legal interest, in accordance with La. R.S. 40:1299.42 B(2).
In all other respects, the May 26, 2000, judgment of the district court is affirmed.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.
NOTES
[1] See Hernandez v. Chalmette Medical Center, 01-0074 (La.App. 4 Cir. 8/22/02), 826 So.2d 641, in which this court remanded the matter, stayed the proceedings in the appellate court, and postponed consideration of the merits.
[2] La. C.C. art. 2324 was amended in 1996 to limit solidary liability for tortfeasors to intentional tortfeasors. Liability for damages caused by two or more non-intentional tortfeasors is now a joint and divisible obligation. However, the amendment removing solidary liability for non-intentional tortfeasors was substantive, and therefore is to be applied prospectively only. Aucoin v. State, Through the Dept. of Transp. & Dev., 97-1938, p. 10 (La.4/28/98), 712 So.2d 62, 67. Accordingly, the prescriptive laws pertaining to solidary obligors will be used to determine the prescription issue in this case, which arose from a 1993 injury.
[3] We therefore need not address the propriety of the trial court's having sustained the objection to this testimony of Dr. Blaylock.
[4] The holding in Weber was essentially superceded by the 1996 amendment to La. C.C. art. 2324 abolishing solidary liability between tortfeasors except in cases of intentional torts. See Dumas v. State, Dept. of Culture, Recreation & Tourism, XXXX-XXXX (La.10/15/02), 828 So.2d 530. However, as previously noted, that 1996 amendment to La. C.C. art. 2324 is to be applied prospectively only. See footnote 2, supra.
[5] Future medical care is provided for in La. R.S. 40:1299.43.
[6] The trial court stipulated, however, that the personal liability of each physician was limited to $100,000 in accordance with La.R.S. 40:1229.42 B(2).
[7] We also note that in the above-quoted passage from Williams, this court erred by citing as authority the appellate decision in Turner v. Massiah without noting the partial reversal of that opinion by the Supreme Court on the issue of the application of multiple medical malpractice caps, a decision which we follow in the instant case. See Turner v. Massiah, 94-2548 (La.6/16/95), 656 So.2d 636.
[8] See footnote 3, supra.